FARMERS' LOAN & TRUST CO. v. BOARD OF SUP'RS OF ALCORN
COUNTY, MISS., et al.

(Circuit Court of Appeals, Fifth Circuit.   April 11, 1899.)

No. 775.

ESCROW—CONTRACT TO CREATE—RIGHT OF DESIGNATED DEPOSITARY TO ENFORCE.
    A legislative act granting a charter to a railroad company contained a provision authorizing any county through which the railroad might be located by a vote to subscribe to the stock of the company and pay therefor in bonds. It further provided that such bonds, when issued, should be deposited with a certain trust company of another state in escrow, to be delivered to the railroad company, as should be agreed upon between the company and the county. A county voted bonds under such provision, the proposition voted on also containing the same provision as to the deposit of the bonds in escrow. The bonds were prepared and signed, but retained by the county. *Held,* that the provision of the charter designating the depositary must be construed as the language of the corporators, and not a requirement of the state, which had no relation to

.the trust company, and, until an escrow was created by the act of the parties in depositing the bonds, the trust company was a stranger to the transaction; that neither the statute nor the action of the county in voting the bonds created any contract relation between the county and the trust company, nor conferred on the latter any rights which would afford the basis for an action by it against the county to compel the delivery of the bonds.

Appeal from the Circuit Court of the United States for the Northern District of Mississippi.

By an act approved February 22, 1890, the legislature of the state of Mississippi granted a charter to the Greenville, Nashville & Chattanooga Railway Company, which, among other things, provides that any county through which the road may be located may subscribe to the capital stock of the road and pay therefor in bonds; that the question of subscription shall first be submitted to the qualified voters of the county; that, upon the petition of 20 legal voters and taxpayers who are freeholders, asking for such election, notice of the election shall be given, to be held in 20 days thereafter; that, at the appointed time and places, the electors shall assemble, and be registered, as required by law, and vote for or against the subscription; that, should two-thirds of the voters so qualified and voting at the election vote for the subscription, the same shall be made. The act also provides that, should the election result in favor of the subscription, the stock shall at once be subscribed and the bonds be at once issued. It further provides that when the bonds are issued the president of the board of supervisors shall at once deposit them with the Farmers' Loan & Trust Company, of the city of New York, to be held in escrow, to be delivered to the railway company at such time as said county and said railway company may fix.

On April 14, 1890, a number of persons, describing themselves as citizens and legal voters and taxpayers of the county of Alcorn and state of Mississippi, filed with the president of the board of supervisors of that county their petition, asking him to order an election to be held in that county on the 5th day of May, 1890, at which the legal voters and taxpayers should vote for or against a subscription by the county for $60,000 of the capital stock of the railway company, in pursuance of, and by virtue of, its charter. On the same day the board of supervisors acted on this petition, and ordered that an election be held on May 5, 1890, at the usual polling places in the county, and that a registration of all persons entitled to vote upon the question of subscription to the stock, and payment thereof in bonds of the county, be had on the day, and at the places when and where, the election was held. The order submitting the question to the electors provided that, if the proposition was carried, bonds in the sum of $60,000 should be at once issued and placed in the hands of the Farmers' Loan & Trust Company, of the city of New York, in escrow. It also provided that $30,000 of the bonds should be delivered on the order of its board of directors to the proper officer of the railway company, attested by the president and secretary of the railway company, for the company, and by the chancery clerk and the president of the board of supervisors of the county, for the county, when the railway company had completed its line of road from a point within the limits of the city of Corinth to a point within 500 yards of the Tennessee river, and that the remaining $30,000 of the bonds should be so delivered when the railroad should be completed to the western or southern boundary of the county of Alcorn. It provided, further, that the railway company should advance to the county the cost of printing the bonds, or should cause the same to be printed, the cost thereof to be refunded by the county to the railway company when it shall run a train of cars drawn by a locomotive the whole distance between the points before mentioned; the delivery of the bonds, and the refunding of the cost of printing thereof, to be upon the condition that the railway company shall complete its road from the Tennessee river to the city of Corinth on or before the 1st day of December, 1891, and shall complete its road to the western or southern line of the county by the 1st day of December, 1893. It provided, also, that the bonds should not draw interest until they had been

delivered to the railway company, or until the railway company became legally entitled to demand their delivery.

On December 12, 1890, the clerk of the board of supervisors certified the action of the board upon the return of the election substantially as follows: "In the matter of the special election held in the county of Alcorn, state of Mississippi, on the 5th day of May, A. D. 1890, submitting to the legal and qualified voters of the county the question of subscription or no subscription of the sum of sixty thousand dollars to the capital stock of the Greenville, Nashville & Chattanooga Railway Company; and it appearing to the satisfaction of this board, from the official returns made to this board by the board of election commissioners, that at the election so held, in pursuance of an order of this board bearing date the 14th day of April, 1890, and the further authority authorizing the same under the act of incorporation creating said railway company, passed by the legislature of the state of Mississippi, and approved the 22d day of February, 1890, that two-thirds of the legal and duly qualified voters of Alcorn county, as shown by the special registration provided for under the law, have voted in favor of the subscription: Therefore it is hereby ordered that the president of this board of supervisors be, and he is hereby, required to issue the bonds of said county, attested by the clerk of the board of supervisors, in pursuance of, and as required by, the order of this board, as aforesaid, and the charter of incorporation of said railway company as aforesaid." The record does not show whether this action of the board of supervisors was had on December 12, 1890, or on some earlier date subsequent to the date of the election.

On January 3, 1898, the Farmers' Loan & Trust Company made a demand in writing on the board of supervisors for the delivery in escrow to them of the bonds in question, and on February 18, 1898, filed its bill in the circuit court of the United States for the Northern district of Mississippi against the county of Alcorn, the board of supervisors of that county, the clerk of the chancery court of that county, and the Greenville, Nashville & Chattanooga Railway Company. After stating the names, residence, and citizenship of the parties, and averring that the matters involved, exclusive of interest and cost, exceeded in value the sum of $2,000, it showed that the grant of the charter was promptly accepted by the incorporators of the railway company under the act, and the corporation was duly and legally organized prior to April 8, 1890; that it has ever since kept up regularly its organization as a railway corporation under its charter; that prior to April 8, 1890, it had located its road through the county of Alcorn, state of Mississippi, and that on or about that date, in strict compliance with the terms and conditions of the charter, there was presented to the board of supervisors of that county a petition signed by more than 20 of the legal voters and taxpayers of the county, all being freeholders therein, asking for an election to determine whether or not the county should subscribe for $60,000 of the capital stock of the railway company at an election to be held on May 5, 1890; that the petition was filed with the president of the board of supervisors of said county on April 14, 1890, and that on that day the board adjudged that the petition was legally and regularly sufficient, and ordered the election to be held on May 5, 1890, to determine whether or not the county should subscribe for $60,000 of said stock, and pay for the same in the bonds of the county in like amount; that the election was held as ordered, and that the proposition to subscribe for $60,000 of stock, and to issue in payment therefor the bonds of the county in like amount, was carried by a vote of over two-thirds of the legal and qualified voters of the county; that the returns of the election were duly certified by the proper officers, and the board of supervisors, at a meeting held shortly after May 5, 1890, and prior to December 12, 1890, canvassed the election returns, and, by a resolution then adopted, adjudged and held that the election had resulted in favor of making the subscription, and in favor of the issuance of the bonds, and it thereupon resolved as follows: "Therefore it is hereby ordered that the president of this board of supervisors be, and he is hereby, required to issue the bonds of said county, attested by the clerk of the board of supervisors as aforesaid, and the charter of said railway company as aforesaid." A copy of the charter and of the petition, the order of the board calling the election, and the action of the board in de-

claring the result of the election, and ordering the issuance of the bonds, were made exhibits to the bill. The bill further averred that, after the board had ordered the bonds to be issued, the railway company and the board agreed upon the form of the bonds and coupons (a copy of which was made Exhibit C to the bill); that the railway company advanced several hundred dollars to the board of supervisors to pay for the preparation of the bonds, and the same were ready for the signature of the proper officials in June, 1890; that the railway company prepared certificates of shares of its capital stock, and caused the same to be properly executed, and held them ready for delivery to the board of supervisors whenever it became entitled to receive them, and still is ready and willing to deliver the same to the proper officers of the county whenever they are entitled to receive them; that the county officers signed and duly executed the bonds, but retained possession of them, and the complainant does not know whether the bonds are yet preserved or have been destroyed; that by section 12 of the charter of the railway company, and by the order for the submission of the question to the voters of the county, it was provided that the bonds when issued should be at once deposited with the complainant, which, however, the county had wholly neglected to do; that, having waited a long time upon the defendant county to perform its duty in the premises, the complainant, on December 29, 1897, for the first time, demanded of the defendant that it issue and deposit the bonds with the complainant as trustee; that this demand was made in writing, and was executed on the board of supervisors on January 3, 1898; that the defendant has continued to neglect so to perform its duty in the delivery of the bonds. The bill charges, on information and belief, that on July 2, 1895, the railway company formally made demand upon the county for the delivery of the bonds to the complainant, but that the board then declined and refused to do so. claiming that it had no power to issue the same, and on that day it adopted and spread on its minutes the following preamble and resolution: "In the matter of the application of the Greenville, Nashville & Chattanooga Railway Company to issue bonds, the board of supervisors of Alcorn county made the following order, to wit: July 2, 1895. The board, after considering carefully the request of F. L. Bates to reissue the county bonds for the use and benefit of the Greenville, Nashville & Chattanooga Railway Company, decides that they have no right to and cannot comply with said request." The bill avers that the complainant is interested in this controversy, being entitled to commissions for its services as trustee from the railway company, for the care of the bonds and for attention to the matter, in an amount in excess of $2,000, exclusive of interest and cost, all as fixed by contract made between the complainant and the railway company; that the only reason given by the defendant for its failure to deliver the bonds is that the railway company had failed to construct and complete the road within the time stated in the order of submission to the electors of Alcorn county. The bill avers that, as soon as the election was held, the railway company proceeded to the work of constructing its road from the Tennessee river to the city of Corinth, and up to the end of 1890 had expended on the construction about $10,000, and by December, 1891, over $20,000, and that since then, from time to time, the company has done additional work on the same costing about $10,000,—making, in the aggregate, about $30,000 expended on that division, which is in length about 18 or 20 miles; that the railway company has never abandoned the construction of the road, or in any manner released the defendant county from the subscription and agreement, but has persistently tried, in good faith, to complete its road from the Tennessee river to the western or southern line of Alcorn county; that the last work of construction on this part of the line was done in the year 1896, at a cost to the railway company of about $5,000. Upon information and belief, the complainant charges that the railway company had its arrangements made and completed as early as the fall of 1890 for sufficient money to complete the line, as contemplated and contracted, from the Tennessee river to the western or southern boundary of Alcorn county, but that the failure of the defendant to deliver the bonds defeated these arrangements, and prevented the construction of the road within the time contemplated in the submission to the electors of the county; and the complainant submits, as a matter of law, that the time for the completion of the road

did not begin to run, or should not be construed as running, until such time as these bonds should be placed with the complainant, and that, in any event, as the defendant county was first in fault, it would be inequitable to allow the county to take advantage of its own wrong by insisting upon a forfeiture by reason of lapse of time. The complainant further charged that the railway company has now arranged for the completion of the road from the Tennessee river to the western or southern boundary of Alcorn county, provided the defendant is required by the court to deposit the bonds with the complainant as trustee and that the trustee is ready to execute the trust. The bill avers that the complainant has no adequate remedy at law. The prayer is that the court adjudge that it is the duty of the board of supervisors of Alcorn county to execute and deliver to the complainant the $60,000 of bonds referred to in the bill, and that, if necessary, a mandatory injunction or other appropriate process shall be awarded to that end, and that all proper and necessary decrees shall be made to secure a proper execution of the trust; that, if said bonds have been destroyed, the defendant shall be required to re-execute and deliver the same to the complainant. On April 4, 1898, the Greenville, Nashville & Chattanooga Railway Company filed its answer, by which it admitted the material averments of the bill, and joined in the prayer that the court may settle and adjudicate all equities between all the parties to the cause. On the same day, the county of Alcorn, its board of supervisors, and the clerk, jointly filed a demurrer to the bill (specifying 16 grounds), which challenged the right of the complainant to maintain the suit, attacked the regularity and legality of the election at which the bonds were voted, invoked the doctrine of laches, and suggested other matters which do not require mention. On April 13, 1898, the circuit court sustained the demurrer, and ordered that unless the complainant did, within 30 days, amend its bill, the same should stand dismissed. The complainant declined to amend, and at the end of the 30 days the bill stood dismissed, from which decree this appeal is taken. The decree of the circuit court does not specify on what ground the demurrer was sustained. The complainant, construing the judgment on the demurrer to sustain the same on each of the grounds specified therein, has assigned, separately, that the court erred in sustaining each of the grounds submitted in support of the demurrer.

Josiah Patterson and George Gillham, for appellant.

J. M. Boone and E. S. Candler, for appellees.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge, after stating the case, delivered the opinion of the court.

Looking through the technical pleadings, it is manifest that this suit is brought and prosecuted substantially in behalf of the appellee the Greenville, Nashville & Chattanooga Railway Company, nominal defendant below. Against it no relief is sought. Considered as a suit between the railway company and the county of Alcorn, the circuit court was without jurisdiction to entertain it. In this court distinguished counsel have submitted a printed argument on behalf of the railway company, in which they say, by way of preface, that the answer of the railway company admits the allegations of the appellant's bill. "Therefore we accept the statement of the case as made in the brief of the counsel for the appellant, and we rely upon the assignment of errors filed by the appellant, assuming that we have a right to be heard herein, the railway company being the principal party in interest." And the first paragraph of the printed argument of these distinguished counsel for the railway company is: "In addition to the elaborate brief already filed for the appellant, we feel that it is our duty to say

the following in regard to the appellant's rights. Though we appear formally on the side of the appellee, yet the railway company is the principal party in interest, and we are entitled to be heard." As already intimated, we fully concur with the distinguished counsel in the suggestion that the railway company is the principal party in interest in the bringing and prosecution of this suit and of this appeal. However, the view we have taken of the appellant's case renders it unnecessary for us to notice further these suggestions as to the real parties to this litigation, and its possible effect in the matter of the jurisdiction of the circuit court.

The statute which granted to the railway company its charter nowhere names the appellant, except in the twelfth section, which reads as follows:

"Sec. 12. That when said bonds are issued the president of the board of supervisors * * * shall at once deposit said bonds, or cause the same to be done, with the Farmers' Loan & Trust Company, of the city of New York, to be held in escrow by said trust company, to be delivered to the president or secretary of said railway company at such time or times as the said counties * * * by their proper officers and the railway company may agree upon."

Neither in this section, nor in any other section, of the act does it appear that the state was making any provision for drawing to itself any benefit from the selection of the appellant as the party to receive delivery of and hold the bonds in escrow. The language of this section, therefore, like any language used in such grants on which parties seek to rely in claiming benefits or exemptions from the state, must be construed, not as the language of the state, but as the language of the corporators. Nor is this well-settled doctrine averted or disturbed by the language of section 16 of the charter, which says that this act shall be liberally construed, so as to fully protect all the purposes and objects of this charter, the creation of this corporation, and the building of this railroad as herein provided, and the operation and use of the same. In the notice and order for the election issued by the president of the board of supervisors of Alcorn county, the charter of the railway is referred to, and the appellant is named as the depositary of the bonds, to be held by it in escrow; but in the order of the board requiring its president to issue the bonds for the county, attested by the clerk, in pursuance of, and as required by, the order of election and the charter of incorporation of the railway company, the appellant is not named. The charter was approved February 22, 1890. The election was ordered on the 14th day of April, 1890, and the order for the issuance of the bonds was made on or before December 12, 1890.

In answer to the suggestion, on behalf of the county, that the appellant had been guilty of laches, counsel for the appellant in their printed brief say:

"The real point of this demurrer must be that the laches consists in the delay on the part of the trustee in its acceptance; but the manifest answer to this is that it was the duty of the defendant, primarily and first, to deliver the bonds or to tender them to the trustee. This the bill shows he [it] never did. Nor does the bill show that the trustee had any knowledge or notice

from any one of his [its] appointment and selection as trustee until shortly before, or some time before, his [its] acceptance, in December, 1897."

It thus appears, even to counsel for the appellant, that no delivery of the bonds was ever made, in escrow or otherwise, and that there is nothing in the charter of the railway company, or in the proceedings providing for conducting and resulting from the submission to the qualified voters of the county of the question as to whether the county should or should not subscribe to the stock of the railway company, to show or indicate that the appellant had any knowledge or notice of these dealings between the appellees until December, 1897, nearly eight years after the approval of the charter, and four years after the latest period allowed for the completion of the road.

The elementary idea of an escrow assumes that the obligatory writing has been delivered by the party executing it to a third person, to be held by him until the performance of a specified condition by the obligee, or the happening of a certain contingency, and then to be delivered by the depositary to the obligee. Definitions vary somewhat in the adjudged cases and the text-books constructed on the adjudicated cases; but to become an escrow, as well as to become a deed or writing of present obligation, there must be delivery of the instrument. This delivery need not be in all cases manual, but, whether manual or symbolical, it must be actual, in order to raise the character of an escrow, and the delivery must be made to a stranger to the contract between the obligor and the obligee; for, if made to the obligee or to his agent, it would, with certain exceptions, at once acquire a present force as a deed or bond. The appellant in its bill styles itself a "trustee," and the brief of its counsel overflows with learning in reference to the powers and duties and rights of trustees. Being a citizen of New York, created and organized under the laws of that state, asking no license or privilege from the state of Mississippi, so far as this record shows, that state could impose no obligation upon the appellant in favor of the county of Alcorn or any other party. Hence the language of section 12 cannot be construed to raise a binding contract between Alcorn county and the appellant. The same is true of the proceedings had in the county before, at, and after the election herein alluded to. The reference to the charter had in these proceedings in no way adds to, or helps out, the language of the statute. The statute does not undertake to impose any duty upon the appellant, but expressly provides that the proper officers of the county and the railway company may agree upon the time or times when such bonds as the county shall issue in payment of subscriptions for stock are to be delivered to the president and secretary of the railway company. It seems to us that this clearly leaves the whole matter with the railway company and the county for adjustment, and that until these parties do agree, and complete their agreement by the delivery of the bonds to the appellant, it has not and cannot have any interest in their negotiations. It has done no service nor contributed anything of value that can support its claim to have an interest in the contract be-

tween these parties. The highest equity, as expressed in the Louisiana Civil Code, goes no further than to provide that a contract, in which anything is stipulated for the benefit of a third person who has signified his assent to accept it, cannot be revoked as to the advantage stipulated in his favor, without his consent. As already noticed, it is not claimed that the appellant signified its assent to accept any benefit under the contract between these parties prior to December, 1897. Therefore, up to December, 1897, it was competent for the parties, or for either of them, to modify or revoke their contract so far as it affected the appellant, and agree to make the deposit contemplated by the statute in the hands of some other person.

On the 1st day of November, 1890, the people of Mississippi adopted a constitution, to be in force and effect from and after that day. Section 183 of this constitution provides:

"No county, city, town, or other municipal corporation, shall hereafter become a subscriber to the capital stock of any railroad, or other corporation or association, or make appropriation or loan its credit in aid of such corporation or association. All authority heretofore conferred for any of the purposes aforesaid by the legislature, or by the charter of any corporation, is hereby repealed. Nothing in this section contained shall affect the right of any such corporation, municipality, or county to make such subscription where the same has been authorized under laws existing at the time of the adoption of this constitution, and by a vote of the people thereof had prior to its adoption, and where the terms of the submission and subscription have been or shall be complied with, or to prevent the issue of renewal bonds, or the use of such other means as are or may be prescribed by law for the payment or liquidation of such subscription or of any existing indebtedness."

It cannot be questioned that, in the instant case, the "terms of submission and subscription" required that the railway company should build its railroad from the Tennessee river to the city of Corinth, on or before the 1st of December, 1891, and should extend and complete the same from the city of Corinth to the western or southern bounds of the county by the 1st day of December, 1893. The bill alleges that on July 2, 1895, the railway company formally made demand of the board of supervisors that it issue the bonds, at which time the board declined and refused to do so, claiming that it then had no power to issue, or to direct or enforce the issuance, of the bonds. As it is clear that the road had not been built, and that no part of it has yet been completed, it may well be doubted whether the saving in section 183 will avail even the railway company, or now permit the county, were it ever so disposed, to issue the bonds in question. Whatever may be the effect otherwise of the alleged primary default on the part of the county, the fact that the terms of the submission and subscription had not been complied with was a matter deserving the grave consideration of the board of supervisors when a formal demand upon it was made in July, 1895, for the issuance of these bonds. Though the bonds may have been lithographed and duly signed, they cannot be said to have ever been issued; and therefore the provision in reference to renewal bonds is of doubtful application. However this may be, and whatever may be the rights of the railway company growing out of the default, if there has been a default on the

part of the county, it seems clear to us that the appellant has shown no right whatever to recover against the county.

In order to show that the matter involved in this controversy equals in value the sum of $2,000, the complainant refers to a contract made, not with the defendant county, but with the defendant railway company, the date and terms of which are withheld from us, but to which the county was not a party, and by which it was not bound, and on which no relief is sought against the railway company. In our opinion, the matters to which we have alluded amply justify the ruling of the circuit court in sustaining the demurrer to the complainant's bill. Therefore the judgment of that court is affirmed.