**BALTIMORE TRUST CO. v. INTEROCEAN OIL CO. (BRITISH AMERICAN OIL PRODUCING CO., Intervener).**

No. 2055.

District Court, D. Maryland.

March 17, 1939.

G. Ridgely Sappington, J. Cookman Boyd, D. Heyward Hamilton, Jr., and J. Cookman Boyd, Jr., all of Baltimore, Md., for Baltimore Trust Co.

Hilary W. Gans and Joseph T. Brennan, both of Baltimore, Md., and W. Valjean Biddison, of Tulsa, Okl., for British American Oil Producing Co.

CHESNUT, District Judge.

The question now presented in the above entitled case is whether a fund of $31,058.70 in the possession of the receiver of the Baltimore Trust Company, Trustee, subject to the order of this court in the above entitled case, should be impress-

ed with a trust in favor of the British American Oil Producing Company. The question arises out of the following circumstance now to be stated, and which I find as facts from the testimony at the hearing and trial on the above intervention of the British American Oil Producing Company.

The Interocean Oil Company is a Delaware corporation which owned oil producing properties in the States of Oklahoma, Kansas and Texas, and a large tract of waterfront property in Baltimore City used principally for oil storage. As of July 1, 1925 the Interocean Oil Company (hereinafter some times referred to as Interocean) executed a deed of trust covering its property to the Century Trust Company of Baltimore as Trustee, to secure an authorized issue of 7% bonds in the amount of $2,000,000, of which $1,850,000 are now still outstanding and unpaid. About the same time it executed another instrument to the same Trustee and one Laithe, covering certain oil producing properties in said States, to secure an issue of so-called "oil run notes" in the amount of $827,877.08, of which amount there are still unpaid $281,481.64. Subsequently the Century Trust Company was merged with the Baltimore Trust Company and the latter became the successor trustee under both instruments. These instruments contained conventional release clauses under which the Trustee upon proper representations was authorized to release land sold in exchange for property received therefor.

Under date of December 30, 1929 Interocean made a written contract with the British American Oil Producing Company (hereinafter some times referred to as British American) to sell to the latter all the property of Interocean in Oklahoma, Kansas and Texas for the sum of $900,000. The contract provided that Interocean should pay and discharge obligations incurred in connection with the property prior to December 1, 1929, and should warrant the properties against liens or claims of liens arising from their operation prior to that date; and should obtain the release of all mortgages. With respect to obligations incurred prior to December 1, 1929, the contract provided as follows: "First party agrees to pay and discharge all obligations incurred by any of said three companies or their predecessor in title in the acquisition, expiration, develop-

ment and operation of the leaseholds and estates so being sold prior to December 1st, 1929, and to discharge and free all property being sold from liens or claims of liens for material furnished or services performed in the development, improvement, operation or use of said property prior to December 1st, 1929, and upon the consummation of this agreement by delivery of instruments contemplated to pass title and acceptance of title, all as herein more specifically referred to, the parties will cause to be deposited in escrow in the First National Bank of Tulsa, Oklahoma, together with a copy of this contract, the sum of Seventy-Five Thousand ($75,000.-00) Dollars, of the total money consideration to be paid as herein provided of Nine Hundred Thousand ($900,000.00) Dollars; the same to remain so in escrow for a period of ninety (90) days from December 21, 1929, as a guarantee and as security for the payment of all obligations of first party or of the other two of said three companies as of December 1st, 1929, pertaining to and arising out of their ownership, use, development and operation of their said properties which said sum of Seventy-Five Thousand ($75,000.00) Dollars is to be at all times available to George W. Snedden, Vice-President of first party, for the payment of obligations incurred in the use, development and operation of said property prior to December 1st, 1929."

The controlling question here is the proper construction of this contract provision, and particularly the phrase "said sum of Seventy-five Thousand ($75,000.-00) Dollars is to be at all times available to George W. Snedden, Vice-President of first party" (Interocean).

The Baltimore Trust Company, as Trustee, and Laithe, by endorsement on the contract, consented to it and by formal separate papers, in accordance with the provisions of the release clauses of the trust instruments, agreed to release the property upon payment of the whole purchase price of $900,000 to the Trustee, subject, however, to the special contract provision as to the $75,000 deposit. Shortly thereafter the contract was consummated by the delivery of proper conveyances by Interocean and released by the Trustees, and the payment of $900,000 by the British American, of which amount $75,-000 was deposited in the First National Bank of Tulsa, Oklahoma, in accordance

with the terms of the contract. The financial transaction was cleared through the Tulsa bank to which the Trustee forwarded appropriate papers and from which it received the $825,000. The $75,000 deposit was made as an escrow deposit in the bank in the name of George W. Snedden, Trustee, and during the ninety-day period Snedden paid various claims and obligations incurred by Interocean in the aggregate amount of $37,313.18. At the expiration of the escrow agreement as provided for, the Baltimore Trust Company, as Trustee, demanded the balance of the deposit and Snedden remitted it to them through the Tulsa bank by check signed by Snedden, Trustee, dated March 30, 1930, in the amount of $37,686.82, bearing the notation "balance of escrow account payable to Baltimore Trust Company and Henry M. Laithe, Trustees, for account of Interocean."

At about the same time Snedden, who had been an operating vice-president in Oklahoma of the Interocean but who shortly after the consummation of the contract became an official of the British American, called attention to the fact that there were still outstanding some unliquidated or otherwise disputed claims or obligations of Interocean as of December 1, 1929, which ought to be taken care of, and upon his request the Baltimore Trust Company and Laithe, as Trustees, agreed to continue to hold the fund for a further period of ninety days from March 21, 1930, for the payment therefrom of further obligations. And during this further ninety-day period upon Snedden's order the Trustee did pay some further drafts upon the fund, and after the expiration of the further ninety-day period, June 21, 1930, the Trustee made some further payments on matters which had previously been in correspondence, all in the aggregate amount of $6,628.12, the last payment of $200 being on July 14, 1930. Thereafter Snedden made no further requests for payment until January 27, 1932, at which time his request was refused by the Committee of Bondholders of Interocean who took the position that no further obligations of Interocean were properly payable from the fund. When the Baltimore Trust Company as Trustee received the balance of the fund from the Tulsa bank, and agreed to hold it in escrow for a further period of ninety days, the account on the books of the Trust Company was described as an escrow fund which

designation was not thereafter changed. About March 1, 1933, the Baltimore Trust Company suspended business at the time of the general banking holiday and did not re-open, being subsequently placed in the hands of a receiver who is still functioning.

On May 23, 1932 the Baltimore Trust Company as Trustee filed its original bill in this court for the foreclosure of the mortgage deed of trust from the Interocean and a sale of the property subject thereto consisting principally of the Baltimore waterfront property, and the immediate appointment of a receiver for the Company under the provisions of the mortgage. A receiver, Joseph P. Connor, was so appointed and is still in office. Diligent efforts have been made by the receiver to sell the principal asset, the Baltimore waterfront property, at private sale, and some time ago it was offered at a public sale at an upset price of $250,000, but was withdrawn when there were no bidders in this amount. The bonds in the amount of $1,850,000 are overdue and still unpaid. The Baltimore Trust Company was itself the owner of a substantial amount of these bonds. These latter facts with regard to the main case in this court appear in the papers in the case.

On June 26, 1933, George W. Snedden and the British American filed their bill of intervention in this case in which they prayed for the following specific relief: "That this Honorable Court shall decree that the sum of $31,058.70 now held by the Baltimore Trust Company in an account entitled 'Interocean Oil Company Escrow Account' is held by the said Baltimore Trust Company, in trust, without time limit but subject to all the other terms and conditions of a certain contract of sale, dated December 30, 1929, between the Interocean Oil Company and the British American Oil Producing Company;".

The Baltimore Trust Company and Joseph P. Connor, receiver, have answered the bill of intervention denying the right to the relief prayed. The issue thus made was not submitted for the determination of the court until very recently. In the meantime obligations of the Interocean arising prior to December 1, 1929, have now matured and been liquidated or reduced to judgments in an amount in excess of the fund in controversy. Mr. Snedden died in 1934.

As previously stated, the controlling question in the controversy is the proper construction of the contract provision which has been quoted. The contest is, of course, substantially between the bond and noteholders secured by the instruments to the Baltimore Trust Company, on the one side, and the British American on the other. The position taken by the former is that the whole proceeds of the sale of the property, to wit, $900,000, became payable to the Trustees subject only to the deposit of $75,000 for the limited period of ninety days, subsequently voluntarily extended for another period of ninety days. The present position of the British American, however, is that the whole $75,000 fund was impressed with a trust at all times thereafter until its exhaustion or final determination that there were no further unpaid obligations of the Interocean.

■ Both sides contend that the quoted clause of the contract is unambiguous on its face and needs no resort to extrinsic evidence. The only possible ambiguity in the contract provisions has relation to the clause "which said sum of Seventy-five Thousand ($75,000.00) Dollars is to be *at all times* available to George W. Snedden." The contention for the bond and noteholders is that the phrase "at all times available" relates to the ninety-day period; while the position now taken by the British American is that the provision should be read "at all times *after* said ninety-day period"; and when so read creates a trust fund as to the $75,000 not only during the ninety-day period but thereafter and until the fund is exhausted or the obligations fully satisfied.

■ I am of the opinion that the construction contended for on behalf of the bondholders is correct, for a number of reasons. In the first place it is the more normal and natural meaning fairly to be attributed to the expression "at all times available to George W. Snedden" when the contract, and particularly the quoted paragraph, is read as a whole. It is clear that the purchase price was to be $900,000, the whole of which was to be at once paid over subject to the exception as to $75,000, which was to be deposited for a limited period of ninety days in escrow. The ordinary meaning of a deposit in escrow is deposit subject to a condition and the condition in this case, looking at the whole subject matter and the particular language,

evidently was that the fund should be applied during the limited period of ninety days to the liquidation of outstanding obligations. It is impossible to ignore the potency of the clear and express provision that the escrow period was to last for only ninety days, and it seems entirely reasonable to refer the expression "at all times" to this period rather than to an indefinite and unlimited future period which is itself in no way limited or defined. Then again the language used "at all times available to George W. Snedden, Vice-President of first party" (Interocean) is certainly not usual or appropriate phraseology to create a trust for an unlimited period in a particular fund. And this last consideration assumes even greater importance from the fact established by the testimony that the contract was drawn by competent and experienced legal counsel for the British American.

As both sides contend that the contract as written is unambiguous, that would seem as a practical consideration to prima facie indicate some actual ambiguity. And in order to have the full situation before me and to get as much light as possible from the actions and correspondence of the parties, all possible and available evidence was received which might throw any light upon the question of the proper construction. If we look to this extrinsic evidence all of it, with one or two possible exceptions, confirms the position taken by the bondholders and is quite inconsistent with the construction now contended for by the British American.

At the outset the phrase "at all times available" to Snedden was given interpretation by him by depositing the fund in the Tulsa bank during the ninety-day period subject to his check. And the bank by letter dated February 11, 1930 advised the Baltimore Trust Company, in connection with the deposit that "We have been handed a letter directing us to forward to you, at expiration of ninety days, the balance of this deposit which has not been used by Geo. W. Snedden in payment of the obligations contemplated by the parties." The account was opened in Snedden's name as trustee and he disbursed it during that period. He kept formal bookkeeping accounts indicating that he was holding it for the account of the British American, and when he made payment thereout, except to the British American, he charged the British American with the

payments. When, upon demand of the Baltimore Trust Company as Trustee, he transmitted the balance of the fund to it, he credited himself and charged the British American with this balance. The voucher attached to the final sum transmitted was debited to the British American Oil Producing Company. Thereafter and until the filing of the intervention in this case June 26, 1933, neither Snedden nor the British American made any *demand* upon the Baltimore Trust Company that it continue to hold the fund in trust but merely *requested* in effect that this be done, although in one letter Snedden does refer to it as an obligation but without stating the ground therefor.

The construction of the contract now contended for seems to be inconsistent with the legal position taken by the British American in its bill of intervention filed in this case on June 26, 1933, with affidavit thereto by Snedden. In the bill the language of the contract is recited, but the construction of the contract itself now contended for is at least not expressly advanced, and on the contrary in paragraph 10 the position is taken that upon the transfer of the fund to the Baltimore Trust Company from the Tulsa bank "the parties to said contract agreed that the unexpended balance should be transmitted to the Baltimore Trust Company to be held in trust subject to the terms of said contract without the ninety day limit, until all such claims and suits were liquidated and determined, and that disbursements would be made from said fund by the Trustee, as and when directed by the said George W. Snedden, against properly supported settlement items."

Here it will be noted that the contention now made that the fund continued to be a trust fund is not put upon the construction of the original contract, but is based on an alleged *new agreement* on or about March 20, 1930, when the fund was transmitted to Baltimore. It is true that the Baltimore Trust Company then agreed to hold the fund in escrow for a further period of ninety days, but the testimony does not show an agreement to continue to hold it thereafter "until all such claims and suits were liquidated and determined" as alleged. Furthermore the contention now made for the British American as to the proper construction of the contract is apparently directly contradicted by the statement made in the letter of June 24, 1930 (offered in evidence by counsel for the British American) from Snedden to the Baltimore Trust Company. In this letter Snedden, in urging the payment of particular obligations of the Interocean then matured, said: "At the time the contract of sale was made the purchaser agreed after much hesitancy to the deposit of only $75,000.00 for ninety days, upon my assurance that Interocean would defend its warranties and take care of all liabilities and in no way jeopardize the titles being acquired by the purchaser, their first requirement being that approximately one-half of the purchase price be deposited until settlement of all contingent liabilities, based primarily upon Interocean's contingent liabilities under pending law suits. It was thought then that settlements could be made within a short time."

Private business contracts of this nature are usually the result of give and take negotiations leading finally to a struck bargain, all the terms of which are not necessarily in themselves logical. It is evident that if Snedden's statement, which under the circumstances was in the nature of an admission, is correct, the negotiations resulted in a bargain between the two companies as vendor and purchaser that only $75,000 of the purchase price should be impounded and that only for the ninety-day period, and the final acquiescence by the British American in these terms was based on its reliance upon the personal assurance of Mr. Snedden that Interocean would anyhow, and quite apart from the time limited deposit, actually discharge its obligations. And in this connection it is to be borne in mind that while subsequent developments in this case show very clearly that Interocean is now thoroughly insolvent, it was at that time apparently by the parties regarded as solvent. It is also to be remembered that while Snedden represented the Interocean in negotiations for the contract, at the time of writing the letter he was apparently really acting in the interest of the British American.

■ The considerable correspondence and other papers received in evidence throw no further important light upon the controversy. The principal item of evidence offered by the British American to support its construction of the contract is the oral testimony of its competent and experienced counsel of Tulsa, Oklahoma,

who there drew the contract for it. He said, speaking from recollection of nine years ago, that after the terms of the contract had been negotiated by Mr. Snedden for the Interocean and by officials of the British American, he was instructed to draw the contract in conference with Mr. Snedden, and after it had been drawn it was forwarded to his client and executed by it. He said in effect, with respect to the phrase "which said sum of Seventy-five Thousand ($75,000.00) Dollars is to be at all times available to George W. Snedden, Vice-President of first party" that this was added by him as an independent and new provision for the purpose of impressing the trust on that sum after the ninety-day period. The particular testimony related to a conference and conversation between him and Snedden before the making of the contract and for that reason and because the item of testimony was seemingly a personal expression of the witness as to his intention, it was in my opinion inadmissible under the ordinary parol evidence rule and the evidence was therefore held at the time inadmissible, although the answer was taken down by the stenographer. But even if this statement of the draftsman of the paper could properly be considered it is, I think, more than off-set by the more explicit statement of Mr. Snedden in the letter of June 24, 1930 made about six months after the execution of the contract, and offered in evidence by counsel for the British American and therefore properly admissible for consideration in the case, especially as Snedden at that time was apparently acting in the interest of the British American and clearly not in that of the bondholders. It is also inconsistent with the actions of the parties with regard to the deposited fund.

▮ Counsel for the British American also point to the fact that the fund was designated on the books of the Trustee as "escrow fund Interocean Oil Company" and was so continued until the receivership of the Baltimore Trust Company in 1933, and naturally has not since been changed. It is urged that this indicates the understanding of the Baltimore Trust Company that the fund was held in trust. The legal meaning of the word "escrow" is, however, not necessarily that of a trust. It signifies that property is held subject to a condition. In this case the condition was that the fund should be applied to obligations of the Interocean during the escrow period. There is no doubt that the fund was in the nature of an escrow when first received by the trustee and the account opened, because it had then agreed to hold the fund for a further ninety days for the payment of maturing obligations of the Interocean. But it is urged that if the Baltimore Trust Company understood the escrow was discharged after that period they should have then distributed the balance of the fund to the bondholders and noteholders in the proportions to which they were respectively entitled, which, under the testimony, was shown to be 40% and 60% respectively; and the failure of the Trustee to do this is urged as an acquiescence by it in the contention of the British American. But I do not think this is a necessary inference. The failure of the Trust Company to promptly distribute the fund after the escrow period is not positively explained in the testimony. But it is to be noted that Mr. Snedden in his letter of June 24, 1930 did indicate that that was the obligation of the Trustee although he did not state the reason therefor. In view of this outstanding contention it is possible the Trustee felt some uncertainty as to the status of the fund and thought it only prudent to hold it temporarily without present distribution. In March 1933 the Trust Company went into the hands of a receiver and its business was discontinued. It is perhaps not unnatural that after nine years the recollection of the details of this transaction by officials of the Trust Company who had the matter in charge is not now available or definite.

▮ In Bouvier's Law Dictionary (Rawles, 3d Ed.1914) an escrow is defined as a deed delivered to a stranger, to be by him delivered to the grantee upon the happening of certain conditions, upon which last delivery transmission of title is complete. The delivery must be to a stranger. It is said in 21 C.J. 867, "Money deposited in a bank to be held until the performance of a condition has been treated as deposited in escrow although this is contrary to the generally accepted or common law meaning of the term". Although the legal term "escrow" is not precisely used with respect to a deposit of money, yet the nature of the so-called escrow as provided for in the contract is clear enough, especially as the named depository, the Tulsa bank, was a third party

or stranger in the transaction. As a deposit with a third party is a usual requisite of a valid escrow, the transfer of the deposit from the Tulsa bank to the Baltimore Trust Company, Trustee, the grantee or owner of the fund, was indicative of the termination of the escrow provided for in the contract; and a circumstance inconsistent with the contention of the British American as to the proper construction of the contract. See 21 C.J. 874; In re International Mineral Co., D.C., 222 F. 415, 424; Farmers' Loan & Trust Co. v. Board of Supervisors, 5 Cir., 93 F. 579, 585; Buckwald v. Buckwald, Md., 199 A. 800, June 14, 1938. Cf. Restatement of Law of Contracts, Vol. I, § 103. At all events it is clear enough that the Baltimore Trust Company as Trustee demanded absolute control of the deposit at the expiration of the ninety-day period and that Snedden then acting for the British American assented to the demand. It was as a matter of grace and not as a matter of right that the Trustee agreed to extend the so-called escrow period for ninety days; and at least after that period the continued designation of the fund as an escrow was apparently a misnomer.

Even if the continuation of the fund under the caption of escrow by the Baltimore Trust Company is a circumstance to be considered in relation to the proper construction of the contract, it is far outweighed by other testimony bearing on the intentions of the parties already referred to. And in this connection we must bear in mind that the fund is and has been for years in the possession of the Trustee for the benefit of the bond and noteholders, and the burden of proof to show the contrary is upon the British American.

Counsel for the British American make another contention. It is this. They say that even if it is clear from the contract that the escrow period was originally limited to ninety days, the subsequent action of the Baltimore Trust Company in granting a further ninety-day extension and then making a few payments shortly thereafter is the waiver of any period for the termination of the escrow. It is also suggested that the same facts in some way constitute an estoppel against the Baltimore Trust Company as Trustee. But I am unable to see how the doctrine of waiver or estoppel is here applicable. If under the terms of the original contract the fund passed to the Baltimore Trust Company as Trustee for the bondholders and noteholders at the expiration of the ninety-day period, their voluntary agreement to extend the period for ninety days and their actual payment of some comparatively small sums shortly thereafter was a matter of grace and not of obligation. The fund cannot be properly impressed with a trust after the period of voluntary extension on the mere doctrine of waiver, in a case of this kind, unless there was a new agreement for an adequate consideration. The testimony does not establish that. It is also doubtful that the Trustee had the power to do so against the interest of the bondholders and noteholders. Nor do I find any element of estoppel here because there is nothing to show that the British American was induced to change its position to its prejudice.

It is also suggested that the expression "at all times" in the contract is not necessarily unlimited but should be construed to be for a reasonable time. But it would hardly be thought that the period of nine years which has elapsed since the making of the contract would be a reasonable time on any theory of construction; nor is there any indication from the contract or the extrinsic evidence which supports such an idea as the agreement of the parties.

The testimony shows that during this nine-year period certain outstanding claims for which the Interocean was liable have been liquidated and are now enforceable against the property purchased by the British American in an amount in excess of the fund in controversy. The principal one of these claims was in litigation when the contract was made, and after a verdict favorable to the Interocean in the trial court, the case was reversed on appeal and has now very recently ripened into a judgment for about $39,000. But there is nothing in the testimony in the case which indicates that if the British American had insisted on maintenance of a trust fund in the $75,000 for nine years the Trustee for the bondholders and noteholders would have assented to that condition. It is not disputed that it is now still the obligation of the Interocean to satisfy these claims but in this respect the British American is only a common unsecured creditor. The nature of the case of the British American naturally makes an appeal in a court of equity, but I cannot find any established equitable principle on which the relief

asked can properly be granted without a forced construction of the contract which would be equivalent to rewriting it for the parties, which of course is not legally or equitably permissible.

I conclude therefore that the intervention proceeding on behalf of. the British American, seeking to impress the fund with a trust in its favor, must be dismissed, with properly applicable and taxable court costs to be paid by the intervenor.

The parties have not had the testimony written up but I have endeavored to state in this opinion all the important relevant facts. If counsel desire further findings of fact, they may submit them for consideration.