AMERICAN SERVICE CO. v. HENDERSON et al.

No. 4755.

Circuit Court of Appeals, Fourth Circuit.

June 10, 1941.

Julius C. Smith, of Greensboro, N.C. (A. K. Orschel, of Chicago, Ill., Smith, Wharton & Jordan, of Greensboro, N.C., and Poppenhusen, Johnston, Thompson & Raymond, of Chicago, Ill., on the brief), for appellant.

John J. Henderson, of Burlington, N. C., for appellees.

Before PARKER, DOBIE, and NORTHCOTT, Circuit Judges.

DOBIE, Circuit Judge.

This is an appeal by the American Service Company (hereinafter called appellant) from a judgment of the United States District Court for the Middle District of North Carolina. The judgment of $1,523.-36 was rendered in favor of E. L. Henderson and Junius H. Harden (hereinafter called appellees) who had sued to recover the remainder of an "escrow" fund allegedly in the possession of appellant.

Appellees, citizens of North Carolina, were the sole stockholders in, and the officers of, the Community Ice & Utilities Company (hereinafter called C. I. U.). Pursuant to a contract dated September 21, 1928, C. I. U. agreed to convey to National Public Utilities Company (hereinafter called National Public) certain properties specifically described in the contract. It was agreed that National Public, in turn, was to assign the acquired properties to a corporation which was soon to be formed, the Community Ice Company (hereinafter called Community Ice); and that the consideration to be received by C. I. U. for these conveyances was to be, in part, the preferred stock of Community Ice. Prior to the closing of the contract and the conveyance of the properties to Community Ice, it was discovered that there were encumbrances on, and defects in, the title of certain of the assets to be conveyed. Among these were an encumbrance on certain Diesel engines and a defect in the title to real estate herein known as the Worth Street property. In order that the deal might be completed, C. I. U., by its officers, the appellees, deposited with National Public 250 shares of the Community Ice preferred stock, issued in the name of appellees, and the stock certificate was by them duly endorsed in blank. Two hundred shares were to be held until the liens on the Diesel engines were removed; fifty shares were to be held as security for the defect in title to the Worth Street property.

Appellant, a Maryland corporation, was the owner of the common stock of Community Ice. As it also desired to purchase the preferred stock and the bonds of Community Ice, appellant entered into a contract with Dawes & Company, investment bankers, whereby Dawes & Company agreed to deliver to appellant all the aforementioned stock and bonds. This contract was made upon the condition that reimbursement should be made to Community Ice for all sums expended by it in removing the liens on the Worth Street property and Diesel engines. There was a provision in the contract that, unless the real estate was conveyed to Community Ice "free and clear", appellant might withhold the sum of $10,000 from the purchase price to discharge the two aforementioned liens. After all the below-described steps were completed, the contract was finally signed on August 23, 1929.

In order to fulfill its contract with appellant, Dawes & Company entered into negotiations with National Public for the purchase of all the preferred stock and the bonds of Community Ice. National Public agreed to deliver the preferred stock to the

First Union Trust & Savings Bank (hereinafter called Union Trust) so that, before payment of the consideration, an examination might be made of the various documents of transfer. Included in this purchase were the 250 shares of preferred stock which had been held by National Public for the purpose of curing the liens on the Diesel engines and the Worth Street property. Appellees, however, had authorized Union Trust and National Public to deliver these 250 shares to Dawes & Company only upon the payment to Union Trust of $10,000.

Pursuant to the terms of its contract with Dawes & Company, appellant had the right to hold $10,000 as security against the liens on the Diesel engines and on the Worth Street property. Appellees were therefore told that the escrow stock was holding up the transaction; that the transaction could be completed only if appellees allowed the $10,000 to be held by Community Ice for the purpose of discharging the liens. Hence, it was finally agreed that certain funds which were soon to be available to C. I. U., appellees, and the other directors, would be transferred to Community Ice for the purpose of discharging these liens. This arrangement was covered by a letter written on August 24, 1929. The letter provided for the payment to Community Ice of $10,000, of which $3,306 was "to be held in escrow pending receipt of the deed to property located on Worth Street", and of which $6,694 was "to be paid into the hands of Community Ice Company to be held in escrow pending settlement of lien in connection with Fairbanks, Morse & Co. (Diesel) engines, on the understanding that when this lien is discharged of record these funds are to be returned to Community Ice & Utilities Company (C. I. U.)."

The full purchase price for the stock was paid by appellant and, in return, it received all the preferred stock of Community Ice. Appellees instructed Union Trust to deliver a check of $10,000 to Community Ice to be used for the disposition of the liens. Subsequently, the sum of $2,150 was paid out to acquire clear title to the Worth Street property, $6,033.28 was paid out to clear the lien on the Diesel engines, and $293.36 was paid out to clear a lien on one of appellant's trucks. Thus, out of the entire so-called "escrow" fund, Community Ice was left with a balance of $1,523.36. The original $10,000 and, after the said payments, the balance of $1,523.36 were both shown on the books of Community Ice as an "escrow" fund.

On August 31, 1929, all of the assets of Community Ice were transferred to, and all of its liabilities assumed by, appellant. Judge Hayes indicated in his memorandum opinion that there was nothing on the records of appellant to indicate that it held "any fund in trust" for appellees; but that the records did show an account of $1,523.36 due to the appellees as of December 31, 1933. After this transfer, Community Ice was dissolved; and, later, on June 12, 1934, appellant filed a petition in compliance with section 77B of the Bankruptcy Act, as amended, 11 U.S.C.A. § 207. This petition was filed in the United States District Court for the Western District of Missouri, the district in which appellant had its principal place of business. Notice of the 77B proceeding was given to all creditors, bondholders, and stockholders, by mail and by advertisement. Appellees, who had claims other than the "escrow" claim against appellant, received notices by mail of this proceeding. Although no schedule setting forth assets, liabilities, and creditors was filed, a balance sheet as of December 31, 1933, was attached to the petition. This balance sheet did not show an "escrow" fund, but it did include the balance of $1,523.36 which was mingled with the cash of appellant.

On July 11, 1934, the District Judge for the Western District of Missouri appointed a trustee for appellant, entered an order determining the time and manner for all claimants to file their claims, and classified the creditors and stockholders of the appellant. Class 6 of this classification included the holders of claims, interests, or securities, of whatever character, which had not been specifically incorporated in the preceding five classes. In the District Judge's order, it was provided that all claims and interests against appellant and its properties should be filed with the clerk of the court on or before September 1, 1934, and that, unless so filed on or prior to that date, the holder of such claim or interest would not participate in any plan of reorganization. Pursuant to the order of the court, the trustee gave notice to all creditors and stockholders of the classification made, and, also, of the time and manner in which claims should be filed.

Appellees admit receiving the trustee's notice; yet they failed to file a claim for

the "escrow" fund. Judge Hayes observed in his memorandum opinion that there was nothing to indicate that appellees had knowledge of the fact that appellant had treated this fund as one of its assets in the reorganization proceeding. The plan was duly confirmed and, on December 5, 1934, a final decree was entered. By this decree, appellant was discharged from all debts, claims and liabilities of any kind and nature whatsoever, whether or not such claim had been filed; and, furthermore, all creditors of, claimants against, and stockholders of appellant were perpetually restrained from instituting or prosecuting any suits or proceedings against appellant or against its assets or property.

On April 22, 1936, the instant action was instituted in the Superior Court of Alamance County, North Carolina, for the recovery of $10,000, allegedly deposited in "escrow" with Community Ice. The case was duly removed to the United States District Court for the Middle District of North Carolina and was, then, referred by Judge Hayes to a Special Master. 35 F.Supp. 732. The Special Master concluded, inter alia, that appellees had been the owners of the $10,000 "escrow" fund; that, as a total of $8,476.64 had been properly applied to the removal of all outstanding liens, appellees were entitled to recover the balance of $1,523.36; that by treating this balance as cash, and not as an "escrow" fund, appellant had committed a "willful and malicious" conversion within the meaning of section 17(2) of the Bankruptcy Act, 11 U.S.C.A. § 35(2); that, as section 17 of the Bankruptcy Act applied to a 77B reorganization, appellant's obligation to appellees had not been discharged and appellees were therefore entitled to the instant recovery.

Judge Hayes approved the Special Master's findings of fact and conclusions of law and, accordingly, entered judgment in favor of appellees. In a memorandum opinion, Judge Hayes gave two grounds for his own conclusions: (1) the instant claim arose from the "willful and malicious" conversion of the "escrow" fund and, under section 17(2) of the Bankruptcy Act, could not have been discharged by the 77B proceeding; (2) title to the "escrow" fund had always been held by appellees and, as appellant had not passed any title to the trustee, the claim to the fund was not subject to discharge.

Section 77B, sub. b(10) states that: "The term 'creditors' shall include for all purposes of this section and of the reorganization plan, its acceptance and confirmation, all holders of claims of whatever character against the debtor or its property, including claims under executory contracts, whether or not such claims would otherwise constitute provable claims under this title." 11 U.S.C.A. § 207, sub. b(10). This same section further states that: "The term 'claims' includes debts, securities, other than stock, liens, or other interests of whatever character." The broad scope of these sweeping definitions has been clearly recognized by the Supreme Court in Foust v. Munson Steamship Lines, 1936, 299 U.S. 77, 82, 57 S.Ct. 90, 81 L.Ed. 49, wherein the court recognized that the terms "creditors" and "claims" are more comprehensive when used in reference to a 77B proceeding than when used in reference to strict bankruptcy. Thus, when section 77B, sub. g, provides that the requisite confirmation of a reorganization plan and the order of confirmation shall be binding upon "all creditors", whether or not their claims have been filed, and when section 77B, sub. h, recognizes that the final decree "shall discharge the debtor from its debts and liabilities", we believe that a claim arising from a "willful and malicious" act of the debtor cannot be excepted from a final discharge. Cf. Underhay, Tort Claims in Receiverships and Reorganizations (1936) 22 Iowa L.Rev. 60, 100; Moreau, Who Are Creditors in a Reorganization Proceeding? (1940) 26 Wash.U.L.Q. 27, 59. The very kernel of a reorganization proceeding is the careful consideration given to all outstanding liabilities, debts, and claims. Only in the light of such an examination does it become possible for the bankruptcy court to determine whether the corporation as recapitalized can weather the financial storm. Cf. Caplin, Valuation and Earnings in Railroad Reorganization (1941) 27 Va.L.Rev. 769, 789. For such an examination and such a determination to be successful, every obligation of the debtor must be brought before the eye of the court.

The Special Master and Judge Hayes were both of the opinion that there had been a conversion of the "escrow" fund, and that such conversion had constituted a "willful and malicious" injury

to appellee's property. We sincerely doubt whether appellant's conduct in reference to the fund would come within the meaning of section 17(2), or even within the meaning of section 17(4) referring to the misappropriations of fiduciaries. See Davis v. Aetna Acceptance Co., 1934, 293 U. S. 328, 332, 55 S.Ct. 151, 79 L.Ed. 393; also, (1935) 21 Va.L.Rev. 444. Cf. In re Hammond, 2 Cir., 1938, 98 F.2d 703, 705 certiorari denied, Hammond v. Irving Trust Co., 1938, 305 U.S. 646, 59 S.Ct. 149, 83 L.Ed. 418. Nevertheless, as we have already indicated, we are of the opinion that section 17(2) and (4) is not to be read in connection with section 77B and that a general discharge in a reorganization proceeding will bar claims both for "willful and malicious" injuries and for "misappropriations" by debtor-fiduciaries. We therefore have concluded that the District Judge erred in his first conclusion. Cf. In re Munson S.S. Line, 2 Cir., 1936, 80 F.2d 859, 860 rev'd on other grounds, Foust v. Munson Steamship Lines, supra; In re McCrory Stores Corp., D.C.S.D.N.Y.1937, 19 F.Supp. 367, 368; In re B. M. O. Corp., D.C.S.D.N.Y.1938, 24 F.Supp. 652, 653.

The second question raised by Judge Hayes presents greater difficulty. Its consideration involves an examination of the steps leading to the formation of the so-called "escrow" fund, an analysis of the legal relations existing among the interested parties, and an inquiry into the manifested intention of the parties.

When appellees delivered the 250 shares of Community Ice preferred stock to Union Trust with instructions that these shares were to be delivered to Dawes & Company only upon the receipt of $10,000, a true escrow had been created. That is, the grantor (Community Ice) had made a valid deposit of the stock with a third-party depositary (Union Trust) and had conditioned the ultimate delivery to the grantee (Dawes & Company) upon a payment of the sum of $10,000. Cf. McPherson v. Barbour, 1919, 93 Or. 509, 183 P. 752; also, Note (1907) 130 Am.St.Rep. 910 et seq. However, when the original instructions to Union Trust were altered, and when the sum of $10,000 was delivered to Community Ice to be used for the discharge of outstanding liens, the escrow agreement was brought to an end and a new legal relationship came into existence.

It is no longer open to question that money may now be delivered in escrow. E. g., Baltimore Trust Co. v. Interocean Oil Co., D.C.Md.1939, 26 F.Supp. 817, 822, 823, affirmed per curiam, 4 Cir., 1939, 105 F.2d 291; Foster v. Elswick, 1928, 176 Ark. 974, 4 S.W.2d 946, 57 A.L. R. 1244; Hildebrand v. Beck, 1925, 196 Cal. 141, 236 P. 301, 39 A.L.R. 1076. But merely labeling a specific delivery of property as an escrow, as was here done, does not give such characteristic to the particular transaction. When the instant negotiations are cleared of all formal technicalities, it becomes evident that Community Ice, completely owned and controlled by appellant, was holding $10,000 of the purchase price of the preferred stock for the purpose of clearing outstanding liens. In other words, appellant had reserved the sum of $10,000, to guarantee or secure the clear title of the purchased property. The application of an escrow tag to this set of facts has no special significance; for, at best, the delivery of the $10,000 check might have created but a trust fund, with Community Ice as trustee and with appellees as the beneficiaries of any balance.

The rule is elementary that a trustee in bankruptcy or reorganization succeeds to only the title and rights in property that the particular debtor had formerly possessed; and that, where the debtor had been in the possession of trust property, the bankruptcy or reorganization trustee holds such property subject to the outstanding interest of the beneficiaries.[1] Thus, where a cestui que trust is able to point to the specific trust property that is being held by the bankruptcy or reorganization trustee, he is rightly entitled to claim this property as his own and to withdraw it from the bankruptcy or reorganization proceeding free from the conditions that may have been imposed upon the general or secured creditors.[2]

[1] Cf. Wood Co. v. Eubanks, 4 Cir., 1909, 169 F. 929, 931, 934–935; Wood Mowing & Reaping Mach. Co. v. Vanstory, 4 Cir., 1909, 171 F. 375, 382, 383–384; Chace v. Chapin, 1881, 130 Mass. 128, 131. See also, In re Commonwealth Bond Corp., 2 Cir., 1935, 77 F.2d 308, 309; In re Prudence Bonds Corp., 2 Cir., 1935, 79 F.2d 212, 215; cf. Glenn, Liquidation (1935) p. 765.

[2] E. g., In re Kline, D.C.W.D.Pa.1934, 7 F.Supp. 850, affirmed, United States Nat. Bank v. Blauner's Affiliated Stores, 3 Cir., 1935, 75 F.2d 826; cf. In re

Clearly, the burden rests upon the claimant to establish the original trust relationship. He must prove his title, identify the trust fund and, where the fund has been mingled with the general property of the debtor, sufficiently trace the trust property.[3]

We do not believe that appellees have met their burden of originally identifying the trust res and of, then, tracing the trust funds. There was no evidence introduced to prove that the $10,000 delivered to Community Ice had been regarded as a separate trust entity. True, it was shown that Community Ice had kept a record of an "escrow fund". But this fact, taken by itself, is not enough to evidence the creation of a trust agreement. We are here seeking to determine the intention of the interested parties; and, from all the evidence submitted, it is at least open to doubt whether the parties actually created a legal relationship different from that of ordinary debtor and creditor. Cf. In re Martin's, D.C.E.D.N.Y.1935, 11 F.Supp. 99; In re United Cigar Stores Co., 2 Cir., 1934, 70 F.2d 313. Also, cf. Britton v. Ferrin, 1902, 171 N.Y. 235, 63 N.E. 954.

We find the case of In re Grigsby-Grunow, Inc., 7 Cir., 1935, 80 F.2d 478, reversed, McKee v. Paradise, 1936, 299 U.S. 119, 57 S.Ct. 124, 81 L.Ed. 75, very informative. Circuit Judge Evans simplified the facts of the case when he stated (80 F.2d at page 481): "It seems we have a case where A, the employees of B, consented to B's taking a certain amount each week from their wages and turning it over to a charitable organization, C, for the purpose of creating a fund to be managed and distributed by C among its ailing members. B deducted the money which A, agreed might be deducted. After deduction, however, instead of B's delivering the money to C, B kept the money."

B (to use Judge Evans' symbols) had thereafter filed a petition in bankruptcy, whereupon A had filed a preferred claim. In reversing the District Court's decree which had disallowed the preferred claim, the Circuit Court of Appeals found (1) that a constructive trust, a trust ex maleficio, had been created and (2) that the trust funds could be followed even though there had been a commingling of the trust funds with private accounts. The Supreme Court reversed the opinion of the Circuit Court of Appeals and, through Mr. Chief Justice Hughes, stated (McKee v. Paradise, supra, 299 U.S. at page 122, 57 S.Ct. at page 125, 81 L.Ed. 75): "It does not appear that it was contemplated that the bankrupt should accumulate or hold any fund. On the contrary, the practice prior to February, 1933, was that the bankrupt regularly paid to the association the agreed amounts. The later failure to pay did not alter the nature of the transaction. The bankrupt was a debtor which had failed to pay its debt. We know of no principle upon which that failure can be treated as a conversion of property held in trust. *At no time throughout the whole period was there a trust fund or res. No fund was segregated or set up by special deposit or in any manner.*" (Italics added.)

After reaching the conclusion that no trust fund or res had been created, the Supreme Court had no need for passing on the question of tracing. See (1937) 23 Va.L.Rev. 458, noting McKee v. Paradise, supra.

At all events, whether or not a trust fund was actually held by Community Ice, appellees have not met their burden of tracing the alleged trust property which had been mingled with appellant's general cash.[4] Appellant admittedly ignored the possibility of the existence of a trust relationship and treated appellees as ordinary creditors. By merely asserting that a trust relationship had formerly existed, appellees cannot now secure a preferred status. Cf. Swan v. Children's Home

Lake's Laundry, Inc., 2 Cir., 79 F.2d 326, 327, 328, 102 A.L.R. 247, certiorari denied, 296 U.S. 622, 56 S.Ct. 144, 80 L.Ed. 442; In re Burgemeister Brewing Co., 7 Cir., 1936, 84 F.2d 388.

[3] See Schuyler v. Littlefield, 1914, 232 U.S. 707, 713, 34 S.Ct. 466, 58 L.Ed. 806; Teter v. Visquesney, 4 Cir., 1910, 179 F. 655. 661; Smith v. Mottley, 6 Cir., 1906, 150 F. 266, 268; In re Meyer, D.C.E.D.N.Y.1901, 106 F. 828, 832.

[4] Schuyler v. Littlefield, 1914, 232 U.S. 707, 713, 34 S.Ct. 466, 58 L.Ed. 806; In re Martin's, D.C.E.D.N.Y.1935, 11 F. Supp. 99, 101; In re United Cigar Stores Co., 2 Cir., 1934, 70 F.2d 313, 316. See also, St. Louis & S. F. R. R. Co. v. Spiller, 1927, 274 U.S. 304, 310, 47 S.Ct. 635, 71 L.Ed. 1060; Hirsch, Tracing Trust Funds—Modern Doctrine (1936) 11 Temp.L.Q. 11; Note (1929) 28 Geo. L.J. 280, 282. But cf. In re Franklin Sav. & Loan Co., D.C.E.D.Tenn.1940, 34 F.Supp. 585, noted in (1941)29 Geo.L.J. 528.

Society, 4 Cir., 1933, 67 F.2d 84, 88. It was incumbent upon appellees to identify the original trust property and to trace it into appellant's general funds. But we find neither allegation nor proof that any fund in appellant's possession had ever been augmented by appellant's alleged conversion.

Appellees had originally proceeded on the single theory that there had been a conversion of trust property and a mingling thereof with general assets. Such assertion constituted a claim in personam—a claim which, as we have already indicated, was extinguished by the reorganization proceeding. Appellees, now, are urging the existence of an in rem claim to specific, trust property. We find nothing in the record to justify this court in impressing any of appellant's assets with a trust.

For the foregoing reasons, the judgment of the District Court is reversed.

Reversed.