In re TATE–JONES & CO., Inc.

No. 21724.

United States District Court
W. D. Pennsylvania.

July 29, 1949.

V. C. Short, Pittsburgh, Pa., John H. Sorg, Pittsburgh, Pa., for Columbian Carbon Co. & Fuller Brush Co.

Elliott W. Finkel, Pittsburgh, Pa., for Eckhart Mfg. Co. & U. S. Vending Corp.

Jerome B. Lieber, Ruslander & Ruslander, Pittsburgh, Pa., for Auto Fender Mfg. Co.

Con F. McGregor, Pittsburgh, Pa., for Trustees.

Isidore Goldsmith, Pittsburgh, Pa., for Creditors' Committee of Debtor.

Charles F. McKenna, Pittsburgh, Pa., for Wage Claimants.

GOURLEY, District Judge.

The matter before the Court arises out of a reorganization proceeding. The question for decision relates to the allowance or disallowance of petitions for reclamation.

Reclamation petitions were filed in behalf of five petitioners, namely Columbian Carbon Company, Fuller Brush Company, United States Vending Corporation, Eckhart Manufacturing Company and Auto Fender Manufacturing Company.

In short, the petitioners seek to reclaim money, or the product of money, advanced to the debtor under circumstances which the petitioners assert raise a constructive trust. The petitions were consolidated for the purpose of hearing.

### History of Debtor Company

The debtor company, a Pennsylvania corporation, for many years prior to February 2, 1948, was engaged in the business of industrial constructors and engineers. C. A. Barrett, one of the trustees and sole stockholder of the debtor corporation, became President January 10, 1943, and held that office until reorganization proceedings were begun in this court on September 9, 1948. Prior to February 2, 1948, the debtor company did not at any time engage in the business of buying, processing or selling steel sheets or steel plates. On February 2, 1948, the debtor did not have any steel on hand and was not equipped with adequate plant facilities to pickle, oil or otherwise process, steel. On February 2, 1948, Tate-Jones & Co., Inc., entered into a written partnership agreement with one E. Arthur Kerschbaumer for the purpose of engaging in the business of buying, processing and selling steel at a profit. This partnership conducted its business under the name of "Tate-Jones & Co., Inc., Special Division." It utilized the plant, office and administrative facilities of the debtor, one of the partners. It kept separate accounts and records of its transactions and it maintained a separate bank account at the Mellon National Bank and Trust Company, Pittsburgh, labeled "Special Account."

The buying and selling of steel by Tate-Jones & Co., Inc., was not a special division except in that it was desired to keep the operations and expenses in separate accounts so as to determine the proportion of costs, commissions and other factors involved.

The special account was to be maintained until the end of the year 1948, at which time it was to be incorporated in the regular records of Tate-Jones & Co., Inc.

## Purpose and Operation of Partnership

The partnership was formed to purchase sheet steel from the mills, to reprocess the same and to sell the reprocessed sheets in the open market. Kerschbaumer was to loan the partnership an amount not to exceed $50,000.00, and was to receive interest at the rate of six percent (6%) for all money loaned, plus an additional allowance for each ton of sheet steel sold. It was further provided that as long as any amount of the advancement made by Kerschbaumer was unpaid, title to all sheet steel was to remain in his name until sold by Tate-Jones & Co., Inc. The proceeds of the sale of sheet steel were to be placed in a bank account in the name of Tate-Jones & Co., Inc., Special Account, and no moneys were to be disbursed therefrom except upon signatures of representatives of both partners. Said Partnership Agreement provided in full as set forth in Footnote One.[1]

Steel was purchased in the open market by lots in odd sizes and according to various specifications, and assembled at the

---

1    "Articles of Agreement

"Made And Entered Into this 2nd day of February, 1948, between E. Arthur Kerschbaumer and Tate-Jones & Co., Inc., a corporation, both of the City of Pittsburgh, County of Allegheny, and State of Pennsylvania, sometimes hereinafter referred to as 'The Partners.'

"1. The Partners have associated themselves together and do hereby associate themselves together for the purpose of the purchase of steel sheets from the mills, to reprocess the same and to sell the same upon the market, and shall continue as partners for the purpose aforesaid during the term of this contract.

"2. E. Arthur Kerschbaumer, the Banker, will loan to the Partners sums of money from time to time to meet the purchase price of steel sheets and freight thereon, but not exceeding the sum of Fifty Thousand ($50,000.00) Dollars, for which the said Banker shall receive interest at the rate of six per cent (6%) per annum, plus Five ($5.00) Dollars per ton of steel sheets sold, until such monies advanced shall have been paid in full. In no event shall said Banker receive Five ($5.00) Dollars per ton for a period of less than three (3) months from the date of this Agreement, even though said loan shall be repaid prior to that date. The Banker shall also receive in addition to the foregoing the sum of Ten ($10.00) Dollars per ton of steel sheets sold during the continuance of this Agreement. Furthermore, said payments shall be made only out of profits and in the manner set forth in Paragraph 6 hereafter. So long as the loan, or any part thereof, remains unpaid, title to all steel sheets purchased shall remain in the Banker until sold by Tate-Jones & Co., Inc. The proceeds of the sale of steel sheets shall be placed in a bank account in the name of 'Tate-Jones & Co., Inc., Special Account,' and no monies shall be disbursed therefrom

except upon the joint signature of T. E. Roop, an officer of Tate-Jones & Co., Inc., and W. R. Dixon.

"(3) (a) E. Arthur Kerschbaumer, acting as Co-Partner, shall arrange for the sale and distribution of the finished sheets and shall provide sufficient sheets for processing at the plant of Tate-Jones & Co., Inc., Beaver Falls, Pa. It is understood and agreed that the sheets delivered to Tate-Jones & Co., Inc., shall be of sufficient quality to permit processing at the nominal cost determined from 'good grade stock.'

"(b) All shipments into Tate-Jones & Co., Inc., plant will be on a sight draft basis; therefore, all drafts must be paid by monies so advanced upon presentation of sight drafts by Tate-Jones & Co., Inc., to E. Arthur Kerschbaumer and/or Mellon National Bank & Trust Company. Such payments to be made from monies advanced as covered in item 2.

"4. Tate-Jones & Co., Inc., agrees to accept sheets for processing at a minimum of 1000 tons per month and further agrees to perform the following operations:

"1. Provide pickling and oiling tanks and processes.

"2. Unload sheets received.

"3. Short and shear to allowable sizes according to sheets received.

"4. Pickle, wash and oil sheets after shearing.

"5. Wrap and band sheets.

"6. Store, if required.

"7. Load and ship to buyer.

"8. After receipt for selling price payment, distribute profits as agreed upon.

"Tate-Jones & Co., Inc., will not ship any finished sheets until money is advanced and paid to cover full shipment and/or order.

"5. Tate-Jones & Co., Inc., shall be reimbursed from first shipment for all costs of providing the facilities to per-

Beaver Falls plant of the company. From the steel they were able to secure, the Partnership attempted to fill the orders of the various customers, process the steel and make shipments.

Shortly after the partnership was formed, the new firm began to purchase certain items of machinery and supplies to make possible the functioning of the enterprise. Out of the Special Division Account make ready equipment was purchased in the amount of $7581.00. From the general fund of the debtor $24,543.09 was paid for make ready equipment, and $20,304.06 for make ready labor.

The expenditures were necessary in order for the Special Division of Tate-Jones & Co., Inc., to be put in operation.

No part of the advancements made by the debtor was ever repaid to its general fund. Kerschbaumer was repaid out of the Special Division Account the $20,000.00 which he had loaned, and in addition thereto the amount of $8,624.85 for interest and expenses incurred in the securing and solicitation of orders.

No salary or wage was paid or received by either of the partners.

It is clear that the expenditure of $44,847.15 was made by the debtor as a partner in a new venture for the purpose of getting it into operation, and would be in the nature of a capital investment. Furthermore, $11,742.98 was expended by the debtor for costs and expenses incident to the processing of the sheet steel. The balance of the costs and expenses being paid out of the Special Division Account.

No part of the expenditures made by the debtor out of its general funds passed through the special account. In addition, $1400.00 was transferred from the general fund of the debtor to the special account, and $6500.00 was transferred from the special account to the general fund of the debtor. Also, approximately $5,000.00 realized from the conducting of the partnership was deposited in the personal account of Barrett, or in one fund or the other of the debtor, to pay expenses incident to the business of the partnership.

As a result of the foregoing, the original intent of the partners was not carried out since expenditures were made by the debtor out of its general fund, and a reference to the records of the Special Division could

form the pickling, wash, oiling, wrapping and banding equipment which may be required to perform and produce finished sheets.

"We have estimated and, of course, the figures are approximate but are included herein as costs to form a basis for this operation.

"1. Approximately $100.00/Ton for sheets F.O.B. mill or source.

"2. Plus $4.00/Ton for freight to Tate-Jones & Co., Inc., plant, Beaver Falls, Pa.

"3. Plus $50.00/Ton for processing at cost which shall include item 1 to 7 inclusive under 5 herein.

"4. Plus cost of providing equipment which should be about $2,000.00. This amount to be paid from first shipment at cost.

"5. Interest 6% on money advanced by E. Arthur Kerschbaumer plus $5.00 per ton until loan is liquidated.

"6. $10.00/Ton to E. Arthur Kerschbaumer.

"It is understood that only actual cost after determination of same will apply and all profits over and above will be distributed as follows and all losses will be sustained and paid as follows:

"1/2 to E. Arthur Kerschbaumer

"1/2 to Tate-Jones & Co., Inc.

"The above profit distribution shall be made and payable by Tate-Jones & Co., Inc., as shipments are made and in accordance with all other terms and conditions outlined herein.

"7. This Agreement shall be valid for two years from date of acceptance hereto and renewable as agreed upon at the expiration thereof.

"8. It is understood and agreed that no other agreement, either verbal or written, is outstanding and that this agreement constitutes the entire agreement between the parties, which shall bind the parties hereto, their successors, heirs, executors, administrators and assigns.

"In Witness Whereof, the parties hereto have hereunto set their hands and seals the day and year first above written.

"Witness:
(a) E. S. George
"Attest:
(s) Wm. S. Long
(a) E. Arthur Kerschbaumer (Seal)
E. Arthur Kerschbaumer
Tate-Jones & Co., Inc.,
By (a) T. M. Roop"

not have given a true or exact statement as to the success or failure of the Special Division.

The total monies deposited and withdrawn from the Special Division Account are as set forth in Footnote Two.[2]

2
"Tate-Jones & Co., Inc.
Special Account
Cash Receipts"

| Date 1948 | Description | | Amount |
|---|---|---|---|
| 2/ 4/48 | Advance by E. Arthur Kirschbaumer | | 10,000.00 |
| 2/11/48 | Advance by E. Arthur Kirschbaumer | | 3,000.00 |
| 2/13/48 | Advance by E. Arthur Kirschbaumer | | 5,000.00 |
| 2/17/48 | Advance by E. Arthur Kirschbaumer | | 1,500.00 |
| 2/19/48 | Advance by E. Arthur Kirschbaumer | | 500.00 |
| 3/ 1/48 | Cushman Motor Works, Inc.,–Customer Advance | | 8,266.00 |
| 3/29/48 | Auto Fender Mfg. Co.–Customer Advance | | 1,250.00 |
| 3/29/48 | United States Vending Corp.–Customer Advance | | 7,050.33 |
| 3/29/48 | United States Vending Corp.–Customer Advance | | 7,050.33 |
| 4/21/48 | Fuller Brush Co.–Customer Advance | | 4,800.00 |
| 4/21/48 | White Aircraft Co.–Customer Advance | | 1,938.75 |
| 4/21/48 | Automatic Range–Customer Advance | | 1,650.00 |
| 4/27/48 | North Jersey Sales & Constr. Co.–Customer Advance | | 2,000.00 |
| | | | 54,005.41 |
| | Brought forward ............................. | | 54,005.41 |
| 5/14/48 | Columbian Carbon Co.–Customer Advance | | 33,880.30 |
| 5/14/48 | Columbian Carbon Co.–Customer Advance | | 1,000.00 |
| 6/ 8/48 | Jessop Steel Company | | |
| | Refund of advance for purchase of steel | | |
| | See disbursements 5/24/48 | 1,772.75 | |
| | Less: Invoice for steel purchased | 1,393.12 | 379.63 |
| 6/ 8/48 | Eckhart Mfg. Co.–Customer Advance | | 3,300.00 |
| 6/ 8/48 | Tate-Jones & Co., Inc.–Transfer to Regular Account | | 1,400.00 |
| 6/24/48 | Plasteel Products Co. (Wire Products Co.)– | | |
| | Refund of Advance for purchase of steel | | 5,000.00 |
| 7/ 8/48 | Roman Bros.–Refund of Advance for purchase of steel | | 3,531.48 |
| 7/29/48 | Columbian Carbon Co.–Credit to | | |
| | Accounts Receivable | 2,016.06 | |
| | Partial Refund of Customer advance | 1,008.03 | 1,008.03 |
| | | | 49,499.44 |
| | Total Receipts | | 103,504.85 |

* * * * * *

"Tate-Jones & Co., Inc.
Special Account
Cash Disbursements"

| Date | Check No. | Description | Amount |
|---|---|---|---|
| 2/20/48 | 1 | Frank B. Foster, Inc.–Equipment | 1,550.00 |
| 2/20/48 | 2 | W. E. Brandt Co.–Equipment | 2,850.00 |
| 2/24/48 | 3 | Frank B. Foster, Inc.–Equipment | 1,550.00 |
| 3/11/48 | 4 | Cash–Return of Advance–E. A. Kerschbaumer | 3,000.00 |
| 3/17/48 | 5 | Jones & Laughlin Steel Corp.–Steel | 1,814.26 |
| 3/22/48 | 6 | E. A. Kerschbaumer–Return of Advance | 1,000.00 |
| 3/23/48 | 7 | A. A. Jones–Steel | 2,650.00 |
| 3/25/48 | 8 | A. A. Jones–Commission–Steel purchase | 533.30 |
| 3/30/48 | 9 | E. A. Kerschbaumer–Return of Advance | 1,500.00 |
| 4/ 5/48 | 1 | Kaplan Trucking Co.–Hauling steel–A. A. Jones | 58.27 |
| 4/ 5/48 | 2 | Ferrotherm Co.–Annealing Steel | 771.45 |
| 4/ 9/48 | 3 | A. A. Jones–Commission–Steel purchase | 240.00 |
| 4/13/48 | 4 | E. A. Kerschbaumer–Return of Advance | 750.00 |

History of Advancements

It was intended by the partners that Kerschbaumer was to supervise all sales, and Roop of the debtor corporation was to supervise the processing of the sheet steel and the filling of customers' orders according to specifications.

The partnership was formed since the debtor and Kerschbaumer realized that the sheet steel market was chaotic and extreme difficulty was being experienced by consumers in securing this product. Contacts existed through the members of the partnership to purchase the hot rolled sheet

| Date | No. | Description | Amount |
|---|---|---|---|
| 4/20/48 | 5 | Edw. J. Boyle Company–Equipment | 435.00 |
| 4/20/48 | 6 | Beaver Valley Service Co.–Hauling steel–Ferrotherm | 60.81 |
| 4/26/48 | 7 | E. A. Kerschbaumer–Return of Advance | 4,785.85 |
| 4/26/48 | 8 | Ferrotherm Co.–Annealing Steel | 494.00 |
| 4/27/48 | 9 | Know–How Inc.–Commission on Sales | 12.51 |
| 4/27/48 | 10 | Automatic Range Co., Inc.–Refund of Advance | 1,309.35 |
| 4/28/48 | 11 | Roman Bros.–Steel | 1,250.00 |
| 4/28/48 | 12 | B. A. Sternberg–Commission–purchase of steel | 250.00 |
| 4/28/48 | 13 | Beaver Valley Service Co.–Hauling Steel–Ferrotherm | 58.51 |
| | | Carried forward .............................. | 26,923.31 |
| | | Brought forward .............................. | 26,923.31 |
| 4/30/48 | 14 | Edw. J. Boyle Company–Equipment | 1,196.00 |
| 4/30/48 | 15 | Roman Bros.–Steel | 5,080.00 |
| 5/ 7/48 | 16 | Roman Bros.–Steel | 920.00 |
| | | Sub–Total | 34,119.31 |
| 5/12/48 | 17 | Henry L. Amdur & Jack Rodman–Return of Advance–E. A. Kerschbaumer | 5,887.50 |
| 5/12/48 | 18 | J. F. Edmonds–Return of Advance–E. A. Kerschbaumer | 3,045.00 |
| 5/12/48 | 19 | Void | |
| 5/12/48 | 20 | F. W. Hepting–Return of Advance–E. A. Kerschbaumer | 1,522.50 |
| 5/12/48 | 21 | E. A. Kerschbaumer–Return of Advance | 500.00 |
| 5/12/48 | 22 | Wire Products Co.–Advance on Steel purchase | 7,000.00 |
| 5/14/48 | 23 | North Jersey Sales & Construction Co.–Advance from Customer | 2,000.00 |
| 5/21/48 | 24 | Drew N. Martin–Steel | 575.00 |
| 5/24/48 | 25 | Brown Steel Sales, Inc.–Steel | 135.20 |
| 5/24/48 | 26 | Jessop Steel Company–Advance on Steel Purchase | 1,772.75 |
| 5/24/48 | 27 | E. A. Kerschbaumer–Return of Advance | 1,984.00 |
| 5/25/48 | 28 | H. & L. Products Co.–Steel | 4,420.00 |
| 5/27/48 | 29 | Roman Bros.–Steel | 1,544.15 |
| 5/27/48 | 30 | Drew Martin–Advance to Salesman | 600.00 |
| 5/27/48 | 31 | Henderson Steel Products, Inc.–Steel | 17,133.75 |
| 5/28/48 | 32 | Tate-Jones & Co., Inc.–Transfer to Regular Account | 3,500.00 |
| 5/28/48 | 33 | E. A. Kerschbaumer–Return of Advance | 150.00 |
| 6/ 9/48 | 34 | Void | |
| 6/ 9/48 | 35 | Carson Steel Company–Steel | 7,941.75 |
| 6/24/48 | 36 | E. A. Kerschbaumer–Return of Advance | 3,500.00 |
| 6/25/48 | 37 | Beaver Valley Service Co.–Hauling Steel to White Aircraft | 81.80 |
| 6/25/48 | 38 | Mellon National Bank–Check Book | 3.00 |
| 7/ 8/48 | 39 | E. A. Kerschbaumer–Return of Advance | 1,000.00 |
| 7/13/48 | 40 | Hess Cartage Company–Hauling Steel from Henderson | 941.65 |
| 7/19/48 | 41 | Tate-Jones & Co., Inc.–Transfer to Regular Account | 3,000.00 |
| 8/18/48 | Debit Memo | Cashier's Check to order of C. H. Bonner, Attorney for Harbison Walker Refractories Co. | 1,147.49 |
| | | Sub–Total | 69,385.54 |
| | | Total Disbursements | 103,504.85 |

steel, and the venture was additionally favored since a profit of at least 100% in the sale after processing could be realized.

Before and after the plant facilities of the debtor company were made ready for the business venture, orders were taken for sheet steel according to sizes and specifications from various customers, among whom were the five petitioning creditors. Between March 29, 1948 and May 11, 1948, the petitioning creditors placed certain orders with Tate-Jones & Company, Inc., Special Division.

This being a new venture and funds being somewhat limited, it was decided between the partners that any customer who desired to purchase the processed steel would be required to deposit at least one-third of the purchase price when the order was accepted. Keeping in mind the limitations which existed in the market for this type of steel, it is readily apparent that the customers would offer no hesitancy in making the deposit to secure a firm commitment that the steel would be furnished. It was agreed that the deposit would be credited to the contract price when the steel was shipped.

The deposits were required by the partnership for two purposes:

(a) To secure the partnership from any financial loss as a result of the failure of the customer to take the sheet steel after it had been processed and sheared to specifications.

(b) To aid in the creation of a fund to which access could be made to purchase the sheet steel in its raw form or as hot rolled sheet steel.

Advancements were made by the claimants, and the amounts involved in the reclamation proceedings are:

| | |
|---|---|
| Columbian Carbon Company... | $32,224.24 |
| Fuller Brush Company........ | 4,800.00 |
| Auto Fender Manufacturing Company ................. | 944.00 |
| Eckhart Manufacturing Company ..................... | 3,300.00 |
| United States Vending Corporation ..................... | 10,010.66 |
| Total ................... | $51,278.90 |

The Cushman Motor Works, Inc., is not a party claimant, but it advanced monies which were deposited in the same account with the above claimants. After credit being taken for steel shipped, the balance of the funds advanced by Cushman amounts to $7,669.85.

The total advancements made by the five claimants and Cushman are $58,948.75.

Since Cushman stands in the same capacity as the claimants, and is not a party to this proceeding, if the position of the claimants is sustained, the amount or share of Cushman should be awarded to the trustees.

It would be grossly inequitable and unfair to permit the claimants to share in the funds of Cushman to the prejudice of the general creditors of the debtor, if the funds are in the category of a trust account.

The percentage which the funds advanced bear to the total claimed, including that of Cushman, is as follows:

| | |
|---|---|
| Columbian Carbon Company........ | 55% |
| Fuller Brush Company ........... | 8% |
| Auto Fender Manufacturing Company ........................... | 1½% |
| Eckhart Manufacturing Company...  | 5½% |
| United States Vending Corporation.. | 17% |
| Cushman Motor Works, Inc......... | 13% |

All monies received from the companies which made the advancements were placed in the account designated as "Special Division, Tate-Jones & Co., Inc.," and were used for either the purchase of steel, make ready equipment or the cost of processing the steel. After the steel was purchased and processed, the steel was to be used to fulfill contracts with the persons who made the advancements or with persons in a similar status.

The steel was purchased from funds advanced by the claimants, from other funds in the Special Division Account, and from the general funds of the debtor.

No agreement existed with any of the customers when the money was advanced or deposited in the special account as to where the money would be deposited, or as to the provisions under which it would be held or spent. None of the customers

had any knowledge of the partnership agreement prior to the time that the advancements were made.

The partnership was terminated by voluntary agreement of the partners on June 16, 1948, at which time the individual partner, Kerschbaumer, was released of all obligations under the partnership agreement and the corporate partner, the debtor, undertook to assume and ratify the obligations of the firm and wind up its affairs.

At the time of the appointment of the Trustees on September 9, 1948, there was a quantity of steel on hand at the Beaver Falls plant, and the company had not yet completed shipment on account of the orders. All of such orders, with the exception of that of the Fuller Brush Company, had been cancelled, and refund of the money demanded.

When the reorganization proceedings were filed on September 9, 1948, a separate group or list of creditors was set forth in the schedule of creditors which was entitled "Cash Advances from Customers on Steel."

### Position of Claimants

(1) That the cash advances were made under an agreement and understanding wherein the moneys were to be held in nature of a trust fund; that title to the money did not pass to Tate-Jones Special Division; that it was not commingled in any way with the general funds of Tate-Jones & Co., Inc., and that said advances were made for a specific purpose of making available sufficient funds for Tate-Jones & Co., Inc., to provide the necessary steel to fulfill the orders of the individuals who made the advancements as a member of the club or pool.

(2) That the total money advanced by the claimants was to be kept in said pool and used only for purposes of buying steel, processing the same, and finishing the steel according to specifications and orders of those who made the advancements, or other customers who were members of the pool or who stood in a similar relation.

(3) That as a result of certain circumstances, agreement and understanding, a constructive trust existed.

(4) That at the time the advancements were made, the financial condition of Tate-Jones & Co., a partnership, was that of insolvency, or, approaching it, that its financial condition was such that a duty and burden existed upon Tate-Jones & Co. to make known those facts to the plaintiffs before the advancements were received. That Tate-Jones & Co. failed to make such facts known, that there were representations to the contrary, and that reliance was made upon said representations, all of which constituted a fraud and creates a trust ex maleficio.

(5) That the money advanced, and which was placed in the special account, can be traced to various sources and various products:

(a) The amount of steel in possession of Tate-Jones on September 9, 1948.

(b) Certain pieces of machinery or equipment which was purchased with funds withdrawn from the special account, and still in the possession of the trustee.

(c) Accounts receivable due and owing to the partnership, arising from the sale of said steel.

(d) The amount of $1147.47 which was in the special fund at the time attachment execution was levied by Harbison-Walker Company against Tate-Jones & Co., Inc.

### Discussion of Legal Principles

The first question to be answered is whether the rights of the parties are to be determined by state law or federal law. Prior to the decision of the Supreme Court in Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, it was settled that the question involved herein did not relate to any rule of property or the construction of a state statute, but merely a principle of equity and hence, federal decisions on equitable principles would prevail in the bankruptcy or reorganization court over state law. In re Blue Bird Appliance Co., 8 Cir., 292 F. 127; John Deere Plow Co. v. MacDavid, 8 Cir., 137 F. 802; Mandel et al. v. Burton, 8 Cir., 292 F. 127, 2 A.B.R., N.S., 42. This was in accord with legal authority and

whether the Tompkins case calls for a reconsideration of these views becomes somewhat argumentative. Colliers on Bankruptcy, 14th Edition, Volume 4, par. 70.25, p. 1147.

■ State law, including its common law, must generally determine whether a trust relation existed and whether the cestui que trust has sufficiently identified trust property. In view of the Tompkins case a reference to the applicable state law is not only appropriate but mandatory. There is no general federal law of trusts but it does not follow because state law decrees that there is a trust and that the claimant is entitled to recover that the bankruptcy court must accede to that result. After bankruptcy state law should not control where it is in collision with an express distributive provision of the Bankruptcy Act, 11 U.S.C.A. § 1 et seq., or where it departs so far from the general norm of trust law that its application would be tantamount to applying a state insolvency rule rather than the bankruptcy rule of distribution. Collier on Bankruptcy, 14th Edition, Vol. 4, par. 7325, p. 1148.

■ Although the rule enunciated in the Tompkins case is determinative of substantive rights, there is still preserved to the federal courts a uniform basis for granting equitable remedies in cases in which substantive rights have arisen under state law. In other words, federal courts are to grant equitable remedies in accordance with their own rules which have been developed out of the English Chancery Practice. Black & Yates v. Mahogany Ass'n, 3 Cir., 129 F.2d 227, 148 A.L.R. 841; Michaelson v. U. S., 266 U.S. 42, 45 S.Ct. 18, 69 L.Ed. 162, 35 A.L.R. 451; Dunn v. Wilson & Co., D.C., 51 F.Supp. 655.

The application of federal law to reorganization proceedings seems to be settled beyond doubt by the decisions of the Supreme Court and other federal courts. It is likewise recognized by state decisions where questions involving the application of state law in bankruptcy matters have been presented. Susquehanna Chemical Corp. v. Producers Bank & Trust Co., 3 Cir., 174 F. 2d 783.

■ It is, therefore, necessary to deal with federal law in all matters concerning the conduct of reorganization proceedings, although, of course, a reorganization court, like a bankruptcy court, takes the property situation as it finds it and property rights will have to be determined by state law prior to bankruptcy or reorganization proceedings. Susquehanna Chemical Corp. v. Producers Bank & Trust Co., supra; Prudence Realization Corp. v. Geist, 316 U.S. 89, 93, 62 S.Ct. 978, 86 L.Ed. 1293; Mac-Bryde v. Burnett, 4 Cir., 132 F.2d 898.

The selection of the appropriate rules of law, that is federal or state law, does not become troublesome. Whether the common law or state law is applied, the same result will be obtained since there does not appear to be any difference in the rules which govern.

Does a constructive trust arise—

(a) Due to the relationship of the parties when the funds were advanced?

(b) Due to the financial condition of the partnership when the orders were taken and deposits required?

■ The statute of frauds in the Commonwealth of Pennsylvania does not apply to constructive trusts or to trusts ex maleficio. Hamberg v. Barsky et al., 355 Pa. 462, 50 A.2d 345.

The main question which exists is part of the complex problem of distributing the assets among the claimants and the general creditors. Ordinarily every claimant to the assets in the hands of the trustee of the bankrupt estate desires priority and for that reason seeks to establish that his property was acquired under circumstances giving rise to a relationship other than that of an unsecured creditor.

■ A person seeking to charge a fund in the hands of the trustee for the benefit of all creditors, as being the proceeds of his property and to have a special trust fund for him, has the burden of proof; and if he is unable to identify the product as representing the proceeds of his property, his claim must fall as all doubts must be resolved in favor of the trustee who represents all creditors. In re Rosenbaum

Grain Corp., 7 Cir., 112 F.2d 315; American Service Co. v. Henderson, 4 Cir., 120 F.2d 525, 135 A.L.R. 1414.

■ A trust creditor is not entitled to preference over general creditors of the insolvent merely on the grounds of the nature of their claim. To authorize such a preference, some specific, recognized equity founded on the relation of the debt to the assets in the hands of the trustee, and which entitled the claimant, according to equitable principles, to a preference to a payment out of those assets, must be established by evidence. The person claiming to be a trust creditor must, in order to establish his rights to a preference, trace the trust money into some specific property, fund, security or account of the person who is insolvent, which has passed into the hands of the trustee of the bankrupt and the proceeds of which are to be distributed. He must identify the fund out of which he demands to be preferred either as the original trust property or as the product of it. If there is any trust property identified, the trustee has assumed charge of it and is holding it as a trustee ex maleficio and the suit for reclamation is a proper procedure. Where there is insolvency, a trust fund is a prior claim if it can be identified, even though it may change in form or species while held by the trustee. Such trust fund does not come into the hands of the trustee for the bankrupt because there it is no part of the bankrupt's estate. Spokane County v. First National Bank of Spokane, 9 Cir., 68 F. 979; In re John Deere Plow Co. v. MacDavid, supra; In re Blue Bird Appliance Co., supra; Farmmers and Mechanics National Bank v. King, 57 Pa. 202, 98 Am.Dec. 215; Central National Bank v. Insurance Co., 104 U.S. 54, 26 L.Ed. 693; MacBryde v. Burnett, 4 Cir., 132 F.2d 898; In re Larkin and Metcalf, D.C., 202 F. 572, 577; In re Franklin Savings & Loan Co., D.C., 34 F. Supp. 585; Lifter v. Earle Co., 72 Pa. Super. 173; Erie County v. Lamberton, 297 Pa. 406, 147 A. 86; Austin-Nichols Co. v. Union Trust Co., 289 Pa. 341, 137 A. 461; Webb v. New Hall, 274 Pa. 136, 117 A. 793, 26 A.L.R. 1; Mehler Appeal, 310 Pa. 25, 164 A. 619.

■ Where a fund is composed partly of a defrauded claimant's money and partly of that of the wrongdoer, it would be presumed that in the fluctuations of the fund it was the wrongdoer's purpose to draw out the money that he could legally and honestly use rather than that of the claimant, and that the claimant might identify what remained as his and assert his right to it by way of an equitable lien on the whole fund or a proper pro rata share of it. Cunningham v. Brown, 268 U.S. 1, 12, 44 S.Ct. 424, 68 L.Ed. 873.

■ It is a fundamental principle of equity that no one can acquire rights in property antagonistic to the person whose interest he has committed himself to protect, nor hold any benefit acquired by fraud or breach of duty. A confidential relationship exists between two persons whenever one has gained the confidence of another and purports to act or advise with the other's interest in mind. A confidential relationship is not limited to any particular association of parties but exists wherever one occupies toward another such a position of advisor or counsellor as reasonably to inspire confidence that he will act in good faith for the other's interest. Hamberg v. Barsky et al., supra.

■ A bankruptcy trustee takes title to all property in which the bankrupt has title, though it be held in trust, but when it appears that a bankrupt is only a trustee and has no beneficial interest in or claim against the property, the court should turn it over to its own true owner where possible. Todd v. Pettit et al., 5 Cir., 108 F.2d 139; Central National Bank v. Insurance Co., supra; Bayne v. U. S., 93 U.S. 642; American Service Co. v. Henderson, supra.

No creditor of a bankrupt can demand that the estate of the bankrupt be augmented by the wrongful conversion of the property of another, or the application to the general estate of property which never rightfully belonged to the vendor. Gorman v. Littlefield, 229 U.S. 19, 33 S.Ct. 690, 57 L.Ed. 1047.

■ Thus where a beneficiary of a trust is able to point to specific trust property that is being held by the reorganization

trustee, he is right to claim this property as his own and to withdraw it from the reorganization proceeding free from conditions that may have been imposed upon the general or secured creditors. It does not appear open to question that money may now be delivered in escrow for a specific purpose. American Service Co. v. Henderson, supra.

The petitioners were unable to identify in any manner any of the steel or machinery as being purchased with their particular funds, and were unable to segregate their deposits from the funds deposited by other customers or by Tate-Jones & Company, Inc., on completed sales to customers. Furthermore, most of the machinery was purchased before any of the petitioners or any other customers had made a deposit. None of the petitioners knew that the other claimants were making advancements or that their money was to be placed in a pool or special division account with the advancements made by any other claimant.

At the time the advancements were made, I do not believe any of the claimants had any knowledge of the partnership agreement nor did they know or even care why the advancements were requested. They were only interested, due to the condition of the steel market, in getting a firm commitment for the filling of their orders.

The partnership agreement further provided that title to all the sheet steel would remain in Kerschbaumer until sold by the debtor and Kerschbaumer repaid for the loans made to the partnership.

The steel and equipment which was in the possession of the trustee at the time reorganization proceedings were filed was purchased through funds advanced by the customers, loans of Kerschbaumer, and from the general funds of the debtor. It is impossible to segregate the funds and say which monies were used for one purpose or the other.

█ It is my opinion that no constructive trust arises due to the relationship of the parties.

Does a constructive trust arise due to the financial condition of the debtor when the advancements were made?

█ Reclamation can be successfully prosecuted only where personal property is clearly identified and has been delivered, to, but where title has not passed to, a bankrupt, or where personal property has been sold to the bankrupt under a fraudulent representation of solvency or under circumstances such as to amount to fraud and the creditor rescinds the contract or is able clearly to identify the property in possession of the trustee. In re Broomhall, Killough & Co., Inc., 2 Cir., 61 F.2d 760.

The burden of proving that the deposits were fraudulently received by the debtor at a time of insolvency rests on the claimants or the depositors of the fund. In re Gubelman et al., 2 Cir., 10 F.2d 926.

█ Where no affirmative representations were made to induce a sale, the seller may rescind by showing that the bankrupt buyer was insolvent at the time he bought, that he concealed his insolvency from the buyer and he never intended to pay for the goods. In re A. C. Kelly & Co., Inc., D.C., 6 F.Supp. 221; In re Julius C. Wolff & Co., 2 Cir., 193 F. 646.

█ Goods may be reclaimed where it is shown that the buyer was insolvent at the time of sale, and that the sale was induced by material false representations of the buyer, even without the proof·that the buyer did not intend to pay; but, in the absence of such material false representations, it is incumbent upon the seller to prove, not only that the buyer concealed his insolvency, but did not intend to pay for the goods when they were purchased. In re Sherman, 2 Cir., 13 F.2d 121; Donaldson v. Farwell et al., 93 U.S. 631, 23 L. Ed. 993; In re Baltimore Shoe House, 4 Cir., 20 F.2d 134; California Conserving Co. v. D'Avanzo, 2 Cir., 62 F.2d 528.

In order for the plaintiffs to support their right to recover, it is necessary to establish that when the demand was made to deposit $1/3$ or $1/2$ of the value of the steel to be purchased for the account of the depositor although similarly situate, the debtor knew at said time it was impossible to comply with the promise to make available the steel, or that said promise amounted to fraud and

deceit. In re James Butler Grocery Co., D.C., 10 F.Supp. 809.

If the debtor made false statements to any one of the plaintiffs when it knew that it was insolvent and unable to fill the contract, such fact would show actual fraud and entitle the plaintiffs to the fund or the property which was created through the monies advanced by the plaintiffs. In re Pacat Finance Corp., D.C., 295 F. 394.

Although insolvency of a buyer at the time of sale has a bearing on the seller's right to reclaim goods after the buyer's bankruptcy, the intent not to pay is not a necessary inference from mere insolvency. Even an insolvent person may expect to extricate himself and have an honest intent to pay. In re A. C. Kelly & Co., Inc., D.C., 6 F.Supp. 221; In re Baltimore Shoe House, supra.

When a buyer fails to disclose his insolvency, but in good faith believes that he will be able to pay for the goods, he is not guilty of a fraud which will entitle the seller to rescind the sale and reclaim the goods in the hands of the trustee in bankruptcy. Pacific States Sav. & Loan Co. v. Commercial State Bank, 46 Idaho 481, 269 P. 86, 59 A.L.R. 446.

I do not believe in this case that there has been sufficient proof of an intent to deceive on the part of the debtor of a known condition of insolvency at the time the transactions were entered into between the debtor and the claimants, and that the failure of the debtor to disclose the financial problems which existed did not amount to such fraud as to entitle the claimants to recover the funds or the goods created through the advancements made from the trustee of the debtor in reorganization.

There must be affirmative proof to show that the bankrupt was under obligation to speak or disclose his financial status in order to support a reclamation proceeding where no request for a statement was made. In re Aarons & Co., 2 Cir., 193 F. 646.

No representations as to solvency were made by the Debtor Corporation or the Partnership, nor did the petitioners rely on the representations as to solvency. I do not believe the partnership or debtor company was insolvent within the intent of the law when the advancements were made. Nor was it the intent of the debtor or partnership not to fill the orders, as agreed, of the customers who made the advancements.

Findings of Fact

(1) Tate-Jones & Co., Inc., debtor, a Pennsylvania Corporation, has for many years been engaged in business as industrial engineers and contractors.

(2) C. A. Barrett became President in 1943 and was President and sole stockholder of said debtor on September 9, 1948 when a Petition for Reorganization was filed in this Court, and C. A. Barrett and Commonwealth Trust Company of Pittsburgh were appointed trustees.

(3) On February 2, 1948, E. Arthur Kerschbaumer and Tate-Jones & Co., Inc., entered into an agreement, whereby steel sheets were to be purchased from the mills, reprocessed and sold upon the market. Under the agreement, Kerschbaumer and his co-partner arranged for the sale and distribution of the sheets. Kerschbaumer was to be paid a commission and in addition thereto was to receive with the Debtor Corporation an equal share of the profits. The Debtor Corporation was to provide the necessary material to process the steel and prepare and ship it.

(4) The operations pertaining to the buying, processing and selling of steel was conducted under the name "Tate-Jones & Co., Inc., Special Division."

(5). The $20,000.00 loaned by Kerschbaumer was deposited in the Mellon National Bank & Trust Company under the name "Tate-Jones & Co., Inc., Special Account."

(6) For make ready equipment the amount of $7,581.00 was expended from the Special Division Account.

(7) From the general fund of Tate-Jones & Co., Inc., $24,543.09 was expended for make ready equipment, which funds were not deposited in the Special Division Account.

(8) From the general fund of the debtor $20,304.06 was expended for labor incident to the installation of the equipment and supplies to make the plant ready for operation.

(9) The amount of $11,742.98 was expended from the general fund of the debtor for costs and expenses incident to the processing of the sheet steel. The balance of the cost and expense incident to processing of sheet steel was paid out of the Special Division Account.

(10) Tate-Jones & Co., Inc., Special Division then proceeded to purchase steel in odd lots by the car in the open market from funds in the Special Account for processing and resale to customers.

(11) Certain lots of steel were purchased from the general funds of Tate-Jones & Co., Inc., and intermingled with steel purchased from the Special Account.

(12) On March 24, 1948, Auto Fender Manufacturing Company ordered certain steel from the Special Division and issued its check to Tate-Jones & Co., Inc., in the sum of $1,250.00, as a fifty percent (50%) advance on steel to be delivered.

(13) Between April 27, 1948 and July 29, 1948 shipments of steel were made on the order to Auto Fender Manufacturing Company, leaving a balance due on account of the deposit of $944.00.

(14) On March 29, 1948, the United States Vending Corporation deposited a sum of $14,100.66 on account of an order for steel to be delivered to it.

(15) Shipments of steel were made to United States Vending Corporation between March 17, 1948 and June, 1948, leaving a balance due on account of the deposit of $10,010.66.

(16) On April 21, 1948, Fuller Brush Company deposited with Tate-Jones & Co., Inc., its check in the amount of $4,800.00 as a deposit on account of steel ordered.

(17) On May 5, and May 11, 1948, the Columbian Carbon Company deposited with Tate-Jones & Co., Inc., checks totaling $34,880.30 on account of orders for steel to be delivered.

(18) During the month of July, 1948, two shipments of steel were made to Columbian Carbon Company, the remaining 50% on such deliveries was paid by Columbian Carbon Company, leaving a balance due on account of the deposit of $32,224.40

(19) On May 25, 1948, Eckhart Manufacturing Company delivered to Tate-Jones & Co., Inc., the sum of $3,300.00 as advanced payment for steel ordered.

(20) On all orders placed by the petitioners and others, a deposit of one-third to one-half of the amount of the sales price was required with the order, in order to protect the seller from any loss due to cancellation of orders after the steel had been purchased, processed and cut according to specifications, and to make available additional capital with which to conduct the business.

(21) In addition to the orders placed by the petitioners, similar deposits from other customers were also placed in the Tate-Jones & Co., Inc., Special Account.

(22) No purchases of steel were made by Tate-Jones & Co., Inc., Special Division, for the special requirements of any of the petitioners. Such steel was purchased in lots in the open market wherever it was available. All orders were orders for the sale and delivery of steel according to certain specifications and sizes when and if secured and processed by the debtor.

(23) "Tate-Jones & Co., Inc., Special Division" was labeled "Special Account" and applied to activities of the debtor in the steel business in order to distinguish it from other accounts of the debtor used in the machinery, engineering and other divisions of the Debtor Corporation.

(24) None of the petitioners had any special interest in or title to the "Special Account."

(25) The machinery purchased to make ready the business venture was purchased either from funds advanced by the petitioners, from funds advanced by Kerschbaumer, or from the general funds of the debtor.

(26) Various consignments of steel were purchased by the Debtor Corporation between March 13, 1948 and June, 1948, for the account of the debtor and with the debtor's money.

(27) None of the steel in the hands of the Trustees nor the processing machinery can be identified as being purchased with funds deposited by any one of the petitioners.

(28) Most of the machinery was purchased before any of the petitioners had made a deposit and testimony showed that the steel was purchased in the open market, some from funds in the Special Account and some from funds in the general account. Some of the wages were paid from the Special Account and some of the salaries were paid from the general account. No provision was set up for payment to the general account of any sum for rental or service at the plant in connection with the processing of the steel.

(29) The Debtor Corporation on June 16, 1948 terminated its partnership agreement with Kerschbaumer and conducted the business thereafter wholly on its own as winding up partner.

(30) None of the petitioners had any knowledge of the partnership agreement and conducted their dealings entirely with the Debtor Corporation.

(31) No representations were made by the Debtor Corporation as to its solvency or insolvency.

(32) At the various times that deposits of money were made by the petitioners, Tate-Jones & Co., Inc., was solvent.

(33) No direct representations were made to any of the petitioners that the particular money which they deposited would be used for the purchase of steel to be delivered to them.

## Conclusions of Law

(1) The money advanced to the partnership at the time their orders were presented was required for one of two purposes:

(a) An advancement or pre-payment to guard or protect the debtor from any loss due to the cancellation of the order, or the failure to accept the merchandise after it had been processed.

(b) To aid in making available sufficient capital to purchase the hot rolled sheet steel from the producer thereof.

(2) No representation was made by the Debtor Corporation to the petitioners as to its solvency or insolvency.

(3) Petitioners have been unable to identify the funds or steel or machinery of the Trustees as having been acquired with particular funds deposited by the petitioners.

(4) The petitioners did not rely on any representations of the Debtor Corporation as to its solvency or insolvency.

(5) The petitioners are merely general creditors of the Debtor Corporation.

(6) No trust can be impressed upon particular funds, particular steel, nor particular machinery in the hands of the trustees.

(7) The petitions for reclamation must be dismissed.

(8) To award or impound the processed sheet steel and the equipment claimed by the petitioners, or the proceeds from the sale thereof, would give to the claimants a preferred status over general creditors of the debtor.

(9) That the processed sheet steel and the equipment to make ready the business venture was either purchased out of advancements made by the claimants, advancements made by Kerschbaumer, or out of the general funds of the debtor.

(10) That it is not possible to segregate what funds were used to purchase any part of the hot rolled sheet steel, equipment used to make ready the operation, or to process the steel to customers' specifications.

(11) No constructive trust exists due to the relation of the parties.

(12) No constructive trust exists due to representations as to financial condition or solvency.

(13) The petitions for reclamation by Columbian Carbon Company, Fuller Brush Company, Auto Fender Manufacturing

Company, Eckhart Manufacturing Company and United States Vending Corporation be and the same are hereby dismissed.

(14) The Order of this Court dated October 1, 1948, impounding the funds from the sale of steel be and the same are hereby modified to release the said fund to the Trustees for proper accounting, together with other funds and assets of the Debtor Corporation.