L. E. CREEL, III, as Trustee in
Bankruptcy of Diversa, Inc.,
Bankrupt, Plaintiff,

v.

BIRMINGHAM TRUST NATIONAL
BANK et al., Defendants.

Civ. A. No. 73–G–287–S.

United States District Court,
N. D. Alabama, S. D.

March 20, 1974.

872

Wilbur G. Silberman, Silberman, Silberman & Loeb, Birmingham, Ala., Vernon O. Teofan, Ungerman, Hill, Ungerman, Angrist, Dolginoff & Teofan, Dallas, Tex., for plaintiff.

Edward Friend, Jr., Sirote, Permutt, Friend & Friedman, Birmingham, Ala., for defendants.

Frank M. Young, III and James C. Wilson, Jr., Bradley, Arant, Rose & White, Birmingham, Ala., for defendant Birmingham Trust National Bank.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GUIN, District Judge.

This case comes before the court on cross motions by the plaintiff trustee in bankrupty and by the defendant bank and individual defendants J. P. and Edward W. Mudd for summary judgment pursuant to Rule 56, F.R.C.P. The case is one of first impression, raising the question whether funds deposited by a corporation in the defendant bank to secure payment of a judgment in favor of two former employees are, upon bankruptcy of the corporation, property of its trustee in bankruptcy.

The court has jurisdiction of this cause by virtue of the provisions of Sections 60, 70, and 67 of the Bankruptcy Act (11 U.S.C. §§ 96, 110, and 107), the plaintiff trustee seeking to recover from defendants money alleged to be property of the bankrupt estate and to avoid certain transfers claimed to be void or voidable under the Bankruptcy Act. The court also has jurisdiction under 28 U.S.C. § 1332, there being complete diversity of citizenship between plaintiff trustee and defendants, and the matter in controversy exceeding $10,000.00, exclusive of interest and costs.

Defendants Mudd, members of their family, and trusts controlled by their family owned all of the common stock of Western Grain Company, a corporation doing business at Birmingham, Alabama. On July 1, 1963, defendants J. P. Mudd (now deceased) and Edward W. Mudd entered into certain employment contracts with Western Grain Company, whereby Edward W. Mudd was "to supervise and direct all sales operations of the business" and J. P. Mudd was "to furnish consultative services" to the company. Edward Mudd's employment was to run for a period of 20 years, beginning March 1, 1964; J. P. Mudd's employment was to begin March 1, 1964, and was to last for his lifetime. Both contracts called for annual payments at varying rates during the contract periods.

On July 18, 1963, Diversa, Inc., a Texas corporation, entered into a contract with the Mudd family by which its wholly-owned subsidiary, United Western Grain Company, purchased from the Mudd family all of the outstanding stock of Western Grain Company. Subsequently there developed a controversy between the Mudds and Diversa, Inc., over the contract of sale, and along with that controversy there arose another disagreement over the contracts of employment. Both J. P. Mudd and Edward W. Mudd brought suit in state court based on their employment contracts.

On February 1, 1968, after prolonged negotiations, all of the parties finally reached an agreement, and this agreement was incorporated into decrees entered by the state court. By the court's decree in the case of Edward W. Mudd (Case No. 145–480, Circuit Court, Tenth Judicial Circuit of Alabama) Western

Grain was to pay to Edward W. Mudd the sum of $400,980.00, to be paid in twelve annual payments of $33,415.00 beginning January 1, 1969. In the case of J. P. Mudd (Case No. 147–799, Circuit Court, Tenth Judicial Circuit of Alabama) the court decreed that Western Grain pay to J. P. Mudd the amount of $109,000.00, one payment of $18,166.66 being due and payable immediately and a like sum being due each consecutive January 1 following until the principal sum was paid.

In accordance with the settlement and to secure the payments due the Mudds under the decrees, Western Grain deposited with defendant Birmingham Trust National Bank the sums of $400,980.00 and $90,833.34. The bank, in writing, acknowledged receipt of the monies and agreed to invest them in time deposits and United States Government obligations with installments maturing on the payment dates given in the decrees; a copy of each decree was attached to the receipt for the money related thereto. Each receipt stated that the defendant bank " . . . unconditionally represents and guarantees to comply in all respects with all payments required to be made under said decree . . . ." Each receipt stated that the guarantee was given "for the purpose of securing Western's obligation to pay such decree in accordance with its terms."

On May 10, 1968, Western Grain and the bank, without notice to either of the Mudd defendants, entered into what they labeled an "Agency Agreement," which detailed the duties of the bank in regard to the money. Specifically, this "Agency Agreement" provided that interest earned on the money would be credited to Western Grain's account and that the bank would be paid $500.00 for each of the twelve years it was to make payments.

On May 1, 1968—also without notice to, or participation on the part of, the Mudd defendants—Western Grain and Diversa, Inc., entered into an agreement whereby Western Grain transferred to Diversa, Inc., "all of its right, title and interest in and to the sum of $400,890.00 [sic] . . . and the sum of $90,833.-34 being held by The Birmingham Trust National Bank for the payment of any and all sums due by Western" to Edward W. Mudd and J. P. Mudd in connection with the two state court decrees. Diversa, Inc., in return, agreed "to indemnify and hold harmless Western from the claims of any persons in connection with said funds, and to insure that all payments required by the terms of said decrees . . . are promptly and timely paid."

Also in May 1968, Diversa, Inc., after disposing of the controversies with the Mudd family, and after agreeing to hold Western harmless from claims and to insure payment in accordance with the decrees, sold Western Grain Company to Savannah Sugar Refining Corporation.

Thereafter, payments were made from the fund to the Mudds as scheduled on January 1, 1969, 1970, and 1971. On March 24, 1971, Diversa, Inc., was duly adjudicated a bankrupt upon an involuntary petition filed March 4, 1971, in the United States District Court in Dallas, Texas, and plaintiff L. E. Creel, III, was appointed trustee in bankruptcy. Further scheduled payments were made in 1972 and 1973.

The plaintiff, as trustee in bankruptcy of Diversa, Inc., assignee of the rights of Western Grain Company, brings this suit to recover those funds remaining in the hands of the bank on March 4, 1971 (under Section 70(c) of the Bankruptcy Act), to recover the January 1, 1971, payments as voidable preferences made within four months of bankruptcy (under Section 60 of the Bankruptcy Act), and to recover those amounts paid to the Mudds since the bankruptcy of Diversa, Inc.

The plaintiff trustee bases his claim primarily upon Section 70(c) of the Bankruptcy Act, which gives the trustee the rights and powers of a recorded judgment creditor on the date of bankruptcy. Section 70(c) provides in part:

. . . The trustee shall have as of the date of bankruptcy the rights and powers of: (1) a creditor who obtained a judgment against the bankrupt upon the date of bankruptcy, whether or not such a creditor exists, (2) a creditor who upon the date of bankruptcy obtained an execution returned unsatisfied against the bankrupt, whether or not such a creditor exists, and (3) a creditor who upon the date of bankruptcy obtained a lien by legal or equitable proceedings upon all property, whether or not coming into possession or control of the court, upon which a creditor of the bankrupt upon a simple contract could have obtained such a lien, whether or not such a creditor exists.

Section 70(c) further provides:

If a transfer is valid in part against creditors whose rights and powers are conferred upon the trustee under this subdivision, it shall be valid to a like extent against the trustee.

This provision serves to bring into focus the issue in this case: Has the plaintiff, as trustee in bankruptcy of Diversa, Inc., acquired any right, title, or interest in the funds deposited by Western Grain with defendant Birmingham Trust National Bank for the purpose of securing payment to the Mudd defendants of the sums payable to them under the state court decrees; and if so, is his right, title, or interest in the funds superior to the rights of the defendants?

■ It is a basic rule of the Bankruptcy Act that the trustee in bankruptcy succeeds to such right or title as the bankrupt had, but only to such right or title, and that if the bankrupt had no right or title, then the trustee succeeds to none. York Manufacturing Co. v. Cassell, 201 U.S. 344, 26 S.Ct. 481, 50 L.Ed. 782 (1906); American Service Co. v. Henderson, 120 F.2d 525 (4th Cir. 1941); Galbraith v. First National Bank of Alexandria, 221 F. 386 (8th Cir. 1915); Bankruptcy Act, Sec. 70(c), *supra*. The court concludes that the bankrupt had no title to the funds on deposit with the defendant bank, and the trustee in bankruptcy therefore cannot recover.

It is the trustee's contention that the defendant bank held the fund as the mere fiscal agent of Diversa, Inc. (through Western Grain); that the Mudds were merely unsecured creditors of Diversa, having never perfected a security interest in the fund; and that the fund might have been levied upon by creditors of Diversa, Inc. However, the Mudd defendants contend, and this court agrees, that the fund was actually held in trust for the Mudds and was out of reach of either Diversa, Inc., or its creditors. The defendants also offer supportable alternative contentions.

■■ First, the court will speak to the question of whether the deposit created a trust or an agency relation between Western Grain and the bank. The trustee makes much argument of the fact that the bank acknowledged receipt "as Agent for Western Grain Company" and that the bank and Western Grain later entered a more specific "Agency Agreement," and insists that the use of these words shows a clear intent that there be an agency relation created; the trustee further argues that, there being no fraud alleged, these words should be taken as controlling of the parties' intent. This court, however, considers as controlling, not the words used, but the intent of the parties, as shown *inter alia*, by the Mudds' insistence on security and by the interpretation actually given the relationship by the parties themselves.

A trust can be defined as "the legal relationship between one person having an equitable ownership in property and another person owning the legal title to such property, the equitable ownership of the former entitling him to the performance of certain duties and the exercise of certain powers by the latter, which performance can be compelled in a court of equity." 54 Am.Jur. Trusts § 4.

Restatement (Second) of Trusts § 2 states that a trust "is a fiduciary rela-

tionship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, *which arises as a result of a manifestation of an intention to create it.*" (Emphasis added.) Can a trust be created without the use of the words "trust" or "trustee"? The Fourth Circuit Court of Appeals has said in considering whether particular wording created a trust:

> We attach no importance to the fact that technical language was not used in the will. Technical language is not required. A trust arises when property is given to one with direction that it be used and applied for the benefit of another. King v. Richardson, 136 F.2d 849, 857 (4th Cir. 1943).

The Supreme Court of Alabama has also clearly stated that there are no magic words, citing with approval the statements of other courts that "No express words are necessary to the creation of a trust if that intention appears," and that creation of a trust "may be inferred from the facts and circumstances of the case." Gordon v. Central Park Little Boys League, 270 Ala. 311, 119 So.2d 23, 27 (1960).

This court, then, considers it unimportant whether the parties ever specifically mentioned a trust. It is abundantly clear that the two Mudds simply wanted to make their payment certain, and to this end insisted that the money be set aside immediately and placed in the hands of a third party, one who would guarantee that payment would be made to them. The agreement by the bank, upon receipt of the money—that it "represents and guarantees to comply in all respects with all payments required to be made under said decree"—shows a clear intention on the part of depositor Western Grain, the bank, and the two Mudd defendants (who had previously approved the wording of the receipt) that the funds be placed irrevocably beyond the control of Western Grain.

Defendants stress the practical construction placed by the parties upon the nature of the funds, and the facts show that Western Grain, Diversa, Inc., and the bank consistently treated and referred to the fund as a "trust" or "escrow" fund. While "escrow" might be an etymologically incorrect term to apply to a deposit of money, the term is frequently so used. 30A C.J.S. Escrows § 3. One of the chief characteristics of an escrow deposit is its irrevocability. 30A C.J.S. Escrows § 5b.

In the balance sheet submitted to Savannah Sugar prior to the sale of Western Grain, dated April 30, 1968, there is listed among assets "Escrow Account—Mudd Fund $491,813.34." Other items show adjustments relating to this "escrow account." Diversa, Inc., on September 4, 1969, wrote Edward W. Mudd, asking him to send to its examiners (Peat, Marwick, Mitchell & Company) confirmation of the amount due him "from the escrow fund." The bank on September 9, 1969, wrote J. P. Mudd, asking him to ascertain the correctness of an enclosed letter to Peat, Marwick, Mitchell & Company "in reference to the above escrow." The letter to Peat, Marwick, Mitchell & Company stated: "As escrow agent on the above account, we certify that according to our records four annual payments in the amount of $18,166.66 each for a total of $72,666.64 will be due under the terms of this escrow agreement by The Birmingham Trust National Bank to Mr. J. P. Mudd as of June 30, 1969." The bank asked Edward W. Mudd to verify the contents of an essentially similar letter, again referring to itself as "escrow agent" and to the agreement as an "escrow agreement."

On May 15, 1970, Diversa, Inc., wrote the bank, asking for "details relative to the amount placed in escrow by the company as security to Messrs. Edward and Joe Mudd." On December 31, 1970, F. B. Haynes, vice president of the bank, wrote to Diversa, Inc., and in his letter spoke of having received that year over

$25,000.00 "representing income derived from the trust." On January 24, 1972, Diversa, Inc., after it had been adjudicated bankrupt, wrote the bank requesting "the status of our escrow with your Bank." On April 13, 1972, Diversa, Inc., again wrote the bank, asking the bank to confirm directly to an accounting firm "the balance of our escrow fund: 'Western Grain & Mudd E/A #5 3774 0' as of December 31, 1971." From the beginning the bank placed the funds and any securities purchased with them under the jurisdiction of its trust department, where there was opened and maintained an account labeled "Western Grain & Mudd E/A [meaning "escrow account"] Account Number 537740."

The foregoing recitation of events shows that all the parties treated the funds as a "trust" or "escrow."

In Bogert, Law of Trusts § 27 (4th ed. 1963) the rule is stated that where a debtor, instead of paying a debt directly, employs a bank to pay it for him and pays the bank cash, the relationship created is generally that of debtor-creditor and not that of trustee-trustor. Most cases in which this issue has been raised have involved a depositor seeking to prove a trust in order to establish a preference to the assets of an insolvent bank over the bank's creditors, but the same principles should be applicable when it is the depositor (alleged trustor) who has become insolvent and the alleged beneficiary who seeks to prove a trust. According to Bogert, it is

> unnatural to expect the bank or other intermediary to use the exact cash or credit delivered to it in accomplishing the desired purpose. It is much more natural to construe the transaction as permitting the intermediary to use any of its cash or credit for that purpose and to be able to appropriate the cash or credit delivered to it for any of its own purposes. Banks and similar intermediaries expect freedom to meet their obligations from any assets which are at the time convenient. Hence, it would seem reasonable that

transactions of this type should be held to create contract relations only, and that the intermediary should not be held a trustee of the cash or credit delivered to it in return for its promise. However, in some cases on more or less satisfactory evidence of an intent to have the very property delivered or its product used to satisfy the obligation of the deliveror, the courts have held that the deliveree was a trustee. *Id.*

The facts in this case show such an intent as to make the general rule stated by Bogert inapplicable; it was obviously not the intent of the parties that the bank meet its obligation to the Mudds out of "any of its cash or credit," or that it "be able to appropriate the cash . . . delivered to it for any of its own purposes." As indicated by the wording of the receipt, which wording was approved by the Mudds, the bank's instruction and agreement was "to invest said money in time deposits or United States Government obligations which shall mature on, to-wit, the payment dates referred to in said decree in sufficient sum to comply with said decree in all respects." The reason for this particular wording was that the Mudds did not want to risk the loss of any of the fund; it was neither their intent, nor the intent of Western Grain or the bank, that the Mudds become mere creditors of the bank, to be paid out of "any of its cash or credit," or that the bank be allowed "to appropriate the cash . . . delivered to it for any of its own purposes." The clear intent of all parties was that the bank put this money into time deposits or United States Government obligations, the funds from which would, on their maturity dates, be paid by the bank to the Mudds. It was for the Mudds that the deposit was made, and on the date of deposit a beneficial interest passed to them, the only limitation being that they would be paid the fund over a period of years. Under these facts, the court holds that the bank held the funds in trust for the Mudds, that Western Grain

upon making the deposit gave up its claim to the funds and thereafter had no interest in the corpus of the funds which could pass to Diversa, Inc., or its trustee in bankruptcy.

In the case of Blakey v. Brinson, 286 U.S. 254, 52 S.Ct. 516, 76 L.Ed. 1089, 82 A.L.R. 1288 (1932), the United States Supreme Court considered the case of a depositor who sought to prove that an insolvent bank had held his deposit in trust. The depositor instructed the bank to purchase certain bonds for him, and the bank later falsely represented that it had done so, whereupon the depositor added funds to his regular savings account to cover the cost. The bank cancelled his credit balance, but remitted no bonds. Justice Stone stated for the Court that the relationship remained that of debtor-creditor. However, he added the opinion that "if the respondent had cashed a check for the amount and had then proceeded to hand the money back under a specific agreement between him and the bank that the money was to be held as a special fund, for the sole purpose of completing the purchase," the result might have been different. "Such a procedure, if actually carried out, might afford a basis,' which is lacking here," said Justice Stone, "for the inference that respondent, no longer content with the role of creditor, had sought to establish a trust fund." 286 U.S. 254, 262–263, 52 S.Ct. 516, 518. The present case is clearly not the same; in this case the bank did acknowledge receipt of a "special fund," which was "for the sole purpose" of paying the Mudds.

It has been held that a trust was created when a depositor made a "special deposit" in a bank. "When a special deposit is made for some specific purpose, other than to be safely kept and returned to the depositor, though it partakes of the nature of a bailment, it is of a peculiar class and creates a trust." Collins v. Morgan County National Bank, 226 Ala. 376, 147 So. 161, 162 (1933). "Special deposit" has been defined by the Alabama Supreme Court as including "money which is to be applied by the bank at the depositor's request for specific purposes." First National Bank of Decatur v. Henry, 159 Ala. 367, 49 So. 97, 100 (1906). This deposit by Western Grain is clearly a "special deposit," and it follows that it must have been in trust.

It is the defendants' contention that money segregated and dedicated to the liquidation of an obligor's certain indebtedness, where the bank has treated the fund as a special deposit, and where there is an irrevocable appropriation of the funds to the debtor's obligation and the debtor has parted with all control of the funds, constitutes a trust fund held by the bank as a trustee and not as a fiscal agent. In support of this proposition they cite several cases; these cases are worthy of consideration and are set out below.

In a bankruptcy proceeding, In re National Public Service Corp., 3 F.Supp. 262 (S.D.N.Y.1933), the trustee in bankruptcy sought to recover money deposited for payment of coupon interest. From the contract made upon deposit, the court found that there had been a trust created and stated:

> It seems to me abundantly clear, therefore, that it could not be supposed for one moment, that, if, at the present time, the New York Trust Company as trustee under the indenture should be faced with two claims for these moneys, namely, a claim by a holder of overdue coupons on the one hand, and this claim of the trustee in bankruptcy on the other, and in order to save itself the possible risk of double liability, should interplead the two claimants, any court would hold on the documents here that the trustee in bankruptcy was entitled to recapture the moneys which are the subject of this controversy. *Id.*, p. 264.

The Fourth Circuit stated in Schloss v. Powell, 93 F.2d 518 (4th Cir. 1948), that money "can be placed in the hands of one person for payment to another under such circumstances that a trust

arises in favor of the latter which he may enforce; and this end may be accomplished by an express declaration of trust or by circumstances indicating an intention of the depositor to place the fund irrevocably beyond his control and to devote it to the indicated purpose." *Id.*, 519. In that case the Seaboard Air Line Railway Company's receivers sought to recover monies deposited by the railway company for payment of coupons on bonds; the court recognized that had there been a trust, the receivers could not get the funds. The court found, instead, a mere agency relationship, pointing out that the depositor was at liberty to use the money for other purposes: "But the deposit of money in a bank by a corporate debtor, with instructions to use it to pay maturing coupons as they are presented by bondholders, no more appearing, is not sufficient to show an irrevocable intention so to apply the fund and to impress it with a trust." *Id.*, 519. In the case presently before this court, that "irrevocable intention" is plainly shown.

In re Associated Gas & Electric Co., 137 F.2d 607 (2d Cir. 1943), involved funds deposited to a coupon account by the bankrupt corporation; the court found no trust, because the funds were not treated as a trust, and said that the "intermingling and indiscriminate use of funds in the coupon account is not consistent with the trust status ascribed to part of them." Those funds were regarded as general assets of the company. However, the district court had found a trust in regard to another fund; the same corporation had deposited $273,910.00, the exact amount necessary, to pay the principal amount of some certificates. The Second Circuit said that while the use of the words "as trustee" is not conclusive proof of an intent to create a trust, none of the attending circumstances contradicted the trust intention expressed, and the district court's holding was upheld on the basis of Steel Cities Chemical Co. v. Virginia-Carolina Chemical Co., 7 F.2d 280 (2d Cir. 1925),

and Rogers Locomotive Works v. Kelly, 88 N.Y. 234.

Plaintiff trustee cites a case related to *Associated Gas & Electric Co., supra,* to show that in such a case as the present one, "the circumstances should 'show beyond a reasonable doubt that a trust was intended to be created.' " 137 F.2d 603, 606. Then he argues that in the present case the circumstances do not clearly show a trust. In essence, he says that before the deposits in question were made, Mr. E. M. Friend, who at the time was counsel to Diversa, Inc., drew up a proposed "security agreement" but that the Mudds rejected it, stating they wanted "something more." That "something more" was the bank's receipt designating the bank as "agent" of Western Grain. But if the Mudds were asking for "something more" than a "security agreement," they must have been asking for what, in legal effect if not in wording, amounted to a trust. Further, plaintiff points out that in their initial answer the Mudds disclaimed any title or right to the fund and relied on the bank's unconditional guarantee that the payments would be made; but this court permitted the Mudds to amend their answer and there is no reason to hold them bound to their original theory, as the plaintiff now insists they should be held. Plaintiff says the Mudds relied on the guarantee, but he points out (as does the bank) that an absolute guarantee by a national bank is *ultra vires* and unenforceable. But without presently having to decide whether the guarantee was *ultra vires*, the court notes that the transaction can easily be upheld, and the *ultra vires* question mooted, if the "guarantee" be interpreted as giving rise to a trust.

The next inquiry before the court is whether that trust established by Western Grain with the Mudds as beneficiaries can be reached by the settlor's trustee in bankruptcy. In essence, Sec. 70(c) of the Bankruptcy Act, *supra,* gives the trustee in bankruptcy all the rights and powers of a recorded judg-

ment creditor on the date of bankruptcy. Under Alabama law, if the settlor of a trust reserves in himself a power of revocation, then for purposes of determining rights of creditors he will be treated as the absolute owner of the trust property. Code of Alabama (1940), tit. 46, § 10. The logical converse of this rule is that if the settlor does not reserve in himself a power of revocation then he will not be treated as the owner. There was nothing about this transaction to indicate a reservation of a power of revocation by Western Grain, and, indeed, all facts indicate Western was to have no further control. Further, the general rule of trusts is that "the settlor cannot revoke the trust if by the terms of the trust he did not reserve a power of revocation." Restatement (Second) of Trusts, § 330. Nor did Western Grain or Diversa, Inc., ever attempt to revoke it. The court must conclude that the settlor had no interest in the corpus of this trust which could be assigned to Diversa, Inc., and Diversa, Inc., therefore had no interest in it that its creditors or trustee in bankruptcy could claim.

In short, the court has no difficulty and no hesitation in finding that under the circumstances of this case the deposit by Western Grain with Birmingham Trust National Bank gave rise to a trust, with the Mudd defendants the beneficiaries; and further, that this trust was irrevocable without the consent of the beneficiaries; and that the trustee in bankruptcy succeeded to no interest in the corpus. The trust or escrow account held by the bank is not such property as vests in the trustee under Section 70 of the Bankruptcy Act. In the Matter of Noel Simon, 167 F. Supp. 214 (E.D.N.Y.1958); Gulf Petroleum S.A. v. Collazo, 316 F.2d 257 (1st Cir. 1963); Stickney v. General Electric Co., 44 F.2d 362 (4th Cir. 1930).

But a holding that the trustee has no interest in the corpus of these funds need not rest only on the finding that the bank held the funds in trust, because even if the relationship between the bank and the depositor was an agency relationship, as the trustee in bankruptcy contends, the agency would be irrevocable, just as the trust would be. It is a general rule that an agency given as security and an agency coupled with an interest are irrevocable by the principal alone. 2A C.J.S. Agency §§ 113–119, 3 Am.Jur.2d Agency §§ 60–67. "It is a generally admitted proposition of law that a principal is not permitted to revoke the authority of his agent, where such authority is coupled with an interest, or where it is necessary to effectuate a security. . . . These are the two established exceptions, which seem, indeed, to be essentially similar in principle. . . . " Chambers v. Seay, 73 Ala. 372 (1882), quoted in Buck Creek Cotton Mills v. Stokely, 236 Ala. 146, 181 So. 100, 107 (1938).

A "power given as security" is defined as "a power to affect the legal relations of another, created in the form of an agency authority, but held for the benefit of the power holder or a third person and given to secure the performance of a duty or to protect a title, either legal or equitable, such power being given when the duty or title is created or given for consideration." Restatement (Second) of Agency, § 138. It is unquestioned that any power held by the bank was created or given for no other purpose than to secure the debt due from Western Grain to the Mudds. Going one step further, when the bank made its "guarantee" that the payments would be made, it of course required security for itself; that security was its power to deal with the deposit. So the funds deposited served to secure the Mudds, and the power created, to secure the bank.

The bank can also be said to have had an agency coupled with an interest. For its services in administering the fund, it was to receive an annual fee of $500.00, certainly not a nominal sum, to come from the interest it collected on the securities purchased with the fund.

If the relationship between Western Grain and the bank be called a "trust," it was irrevocable and Western Grain had no interest in the corpus which it could assign to Diversa, Inc., and Diversa, Inc., therefore had no interest which could pass to the trustee in bankruptcy. If the relationship be called an "agency," it was irrevocable and the same result would follow. Thus it is the court's conclusion and holding that the trustee in bankruptcy succeeded to no interest in the corpus of the funds in question, either in the monies remaining in the fund or in those heretofore paid by the bank to the Mudd defendants, and the bank and the Mudd defendants are entitled to summary judgments in their favor, there being no genuine issue of fact.